IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| IN RE: | § CASE NO. 24-90575-11 |
| | § HOUSTON, TEXAS |
| INTRUM AB, | § MONDAY, |
| | § NOVEMBER 18, 2024 |
| DEBTOR. | § 4:01 P.M. TO 6:44 P.M. |

### **FIRST DAY HEARING (VIRTUAL HEARING)**

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

| | |
|---|---|
| APPEARANCES: | SEE NEXT PAGE |
| CASE MANAGER: | ROSARIO SALDANA |
| ERO: | ZILDE COMPEAN |

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**APPEARANCES (VIA ZOOM):**

FOR DEBTOR:                          PORTER HEDGES, LLP
                                     John F. Higgins, IV, Esq.
                                     1000 Main Street
                                     Suite 3600
                                     Houston, TX  77002
                                     713-226-6648

                                     MILBANK LLP
                                     Dennis Dunne, Esq.
                                     55 Hudson yards
                                     New York, NY  10001
                                     212-530-5000

                                     MILBANK LLP
                                     Andrew Leblanc, Esq.
                                     1850 K. Street NW
                                     Suite 1100
                                     Washington, DC  20006
                                     202-835-7500


FOR U.S. TRUSTEE:                    OFFICE OF THE US TRUSTEE
                                     Jason B. Ruff, Esq.
                                     515 Rusk Street
                                     Suite 3516
                                     Houston, TX  77002
                                     713-718-4650


FOR AD HOC COMMITTEE OF
2025 NOTE HOLDERS                    QUINN EMANUEL URQUHART &
                                     SULLIVAN, LLP
                                     Ben Finestone, Esq.
                                     Chris Porter, Esq.
                                     51 Madison Avenue
                                     22nd Floor
                                     New York, NY  10010

**APPEARANCES (VIA ZOOM - CONT'D):**

FOR ARINI CAPITAL
MANAGEMENT, LTD.                    PAUL HASTINGS, LLP
                                    Charles M. Persons, Esq.
                                    J.D. Goldman, Esq.
                                    2001 Ross Avenue
                                    Suite 700-168
                                    Dallas, TX  75201
                                    972-936-7500


FOR AD HOC COMMITTEE
MAJORITY NOTE HOLDERS:             LATHAM AND WATKINS
                                    Adam Goldberg, Esq.
                                    1271 Avenue of the Americas
                                    New York, NY  10020
                                    212-906-1828



FOR RCF STEERCO GROUP:             CLIFFORD CHANCE US LLP
                                    Maja Fink, Esq.
                                    Two Manhattan West
                                    375 9th Avenue
                                    New York, NY  10001
                                    212-878-8000




(Please also see Electronic Appearances.)

### INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Andrés Rubio | | | | |
| By Declaration | 49 | . | . | . |
| By Mr. Finestone | . | 50 | . | . |

| EXHIBITS: | Admitted |
|---|---|
| Declaration of Mr. Rubio | 47 |

**\*\*\***

**HOUSTON, TEXAS; MONDAY, NOVEMBER 21, 2024; 4:01 P.M.**

THE COURT:  I'm going to call the 4:00 p.m. First Day Hearing in Intrum.  There's no one in the courtroom today.  Today is a virtual hearing.  The line has been completed muted.  So I'm going to ask if parties wish to make an appearance that you please hit five star and I will unmute your line.  And I will just go in the order in which I see them.

I'd also ask parties to please make an electronic appearance, if you jump on Southern District of Texas webpage, find the Bankruptcy Section you'll find my home page, and you'll find a link to make an electronic appearance.  And I ask that you please do so as well.

And I'll just start to unmute lines.

Here's a 212 number.

MR. LEBLANC:  Your Honor, good afternoon.  This is Andrew Leblanc of Milbank.  You may have unmuted my line first.

Mr. Dunne will take the lead for us this afternoon.

THE COURT:  Okay.  Good afternoon.

Here's another 212 number.

MR. FINESTONE:  Good afternoon, Your Honor.  Ben Finestone, Quinn Emmanuel, with my partner Chris Porter on behalf of the Ad Hoc Committee of Noteholders -- the Ad Hoc Committee of 2025 Noteholders, Your Honor.

THE COURT: Good afternoon.

Here's another 212

MR. DUNNE: Your Honor, can you hear me?

THE COURT: Just fine.

MR. DUNNE: Great, hi. Good afternoon, Your Honor. Dennis Dunne of Milbank LLP, proposed counsel for Intrum AB and Intrum AB of Texas, LLC. And with me in the virtual courtroom, you've already spoken with one of my partners, Mr. Andrew LeBlanc and also Jimmy Scale (phonetic) is with me.

THE COURT: Okay, good afternoon.

There's a 972 number.

(No audible response.)

THE COURT: 972 number?

MR. PERSONS: Good afternoon, Your Honor. Good to see you again. Charles Persons of Paul Hastings on behalf of Arini Capital Management. We are the largest unsecured Noteholder of Intrum AB and signatory to the Lock-up Agreement.

THE COURT: Okay.

MR. PERSONS: With me in the courtroom is my partner JD Goldman.

THE COURT: Good afternoon.

And here's a 202, number. I believe that might be Mr. Ruff.

MR. RUFF: Good afternoon, Judge. Jayson Ruff

appearing for the U.S. Trustee.

THE COURT: Good afternoon.

Here's a 212 number.

MR. GOLDBERG: Good afternoon Your Honor. Adam Goldberg of Latham and Watkins on behalf of the known Ad Hoc Group.

THE COURT: Good afternoon.

And a 713 number.

MR. HIGGINS: Good afternoon, Your Honor. John Higgins, Porter and Hedges, appearing on behalf of the Debtors with the Milbank firm.

THE COURT: Okay. Good afternoon.

Anyone else wish to make an appearance, please hit five star.

(No audible response.)

THE COURT: All righty, I will let folks know I'm going to turn this over to Mr. Dunne. I did see -- traditionally enter a couple of kind of housekeeping orders.

So I may have -- it may have hit the Docket already. I've approved joint admin, the complex designation, and the claims and noticing agent application. So we can take those off the table.

But maybe, Mr. Dunne I can turn it over to you and you can tell me where we go.

MR. DUNNE: Great. Thank you, Your Honor. And we

appreciate you entering those Orders.

In terms of the road of show today, I propose with Your Honor indulgence, of course, that I make some introductions and then provide the Court and the parties with an overview of the company's business, its history, the events that have brought us to Your Honor's courtroom today, and then after my initial presentation, I'll yield the virtual podium to other parties who want to make any kind of preliminary statements. And then Sullivan Milbank, who will handle the various motions on the Agenda and the relief requested therein.

If that's okay with you, I'll jump into it.

THE COURT: Okay, that's sounds good to me. Thank you.

MR. DUNNE: Thank you, Your Honor. We'll also have some slides to share with everybody in a few minutes, but I will ask you to designate one of my colleagues when I get to them with text capabilities.

But let me start with some introductions of people we have in the virtual courtroom today. From the company, we have Andrés Rubio, the CEO and President of Intrum. Mr. Rubio is also our First Day Declarant and available to testify today if needed.

You met our co-counsel, Your Honor, during appearance, John Higgins of Porter Hedges. The company's

proposed investment banker is Houlihan Lokey, Manuel Martinez Hidalgo is on the line this evening.

The company's proposed financial advisor is Alex Partners.  Cairina Bailer (phonetic) is in the virtual courtroom today.  And last but not least our claims agent is Kroll and Ben Steel from Kroll is on the line today.

It maybe helpful in a similar vein, Your Honor, to just quickly identify for you some of the other key professionals in the case and you may be hearing from them later today as part of the First Day Hearing.

The revolving credit facility, which I'll talk more about in detail later, is represented by Clifford Chance and Rothschild.  The first lien term loan is represented by Anno Sherman.  They're also unimpaired under plan.

The Ad Hoc Committee of Majority Noteholders supporting the Plan is represented by Latham and PJT.

The Minority group that is objecting is represented by Weil Gotshal and Quinn Emmanuel.

Before, I go, Your Honor, to the merits of the presentation, let me express on behalf of myself and on the company's behalf, our deepest gratitude to Your Honor, to the Court, to your Chambers for accommodating the First Day Hearings on short notice and so late in the day.  It is truly appreciated.

Let me also express the company's sincere

appreciation to the Office of the United States Trustee who was immediately and repeatedly available to review our draft pleadings and to jump on calls if necessary to discuss ways to resolve their concerns and minimize issues that will bubble up to Your Honor today for resolution.

Turning to the specific of the case, I say at a very high level, Your Honor, despite the filings, we have very good news.  As you'll hear throughout today's presentation, we spent most of this year analyzing ways to address the company's approaching debt maturity.  And you'll hear how we engaged in comprehensive and lengthy negotiations with our various creditor groups.  The result of those tireless and at times contentious times efforts is clear and has been successful.

We have a pre-packaged Plan of Reorganization that has garnered overwhelming support in the voting classes.  We appear before Your Honor today with 100 percent of the secured creditors voting in favor of the Plan and 82 percent of the unsecured bonds.

The other classes are unimpaired and riding through. Most of our debt at the unsecured level is US issued, Your Honor, and governed by New York law.  The parent company is a Swedish entity and we also have some Swedish debt.

As a result, we intend to run two processes to effectuate the deal.  As an aside -- and this is purely a

digression and really for the bankruptcy nerds out there -- the process we propose to run is not dissimilar to the process SAS Scandinavian Airlines recently undertook as well where they prosecuted both a Chapter 11 Plan and Swedish Court process.

In our case, the first step will be to seek confirmation of the pre-packaged Plan of Reorganization here and to obtain a discharge put in New York governed bond and other debt as well.

The second step will be a two-step Swedish process. One part will be an in-court Swedish process to obtain analog relief there, to, among other things, deal with Swedish debt and local holders.

And the second part will be a stockholder meeting in Sweden to approve the issuance of 10 percent of the equity shares that'll be distributed to the unsecured bondholders as contemplated by the transaction embodied in the pre-packaged plan before the Court.

I want to emphasize a few points about the case here, particularly what this case is not. What it is, is an extremely simple Chapter 11 case. We're not asking the Court to do anything other than to approve a Plan that has substantial creditor support.

It is not a cram-down plan, Your Honor. We have no rejecting classes of claims or interest. We are not filing to

take advantage of the other powers that the Court may have under the Bankruptcy Code.  We're not seeking to reject contracts.  We're not seeking to prosecute avoidance actions or to estimate claims or to subordinate any claims.

We're not doing any of those things.  We have one loan antagonist remaining, Your Honor.  It's a group of holders represented for the past year by Weil Gotshal of near dated maturities.

They recently brought in Quinn Emmanuel, and you'll hear from Mr. Finestone soon enough, to prosecute various objections and to generally throw a (indiscernible) into the works.  The Court has seen some of their handiwork already with Motions to Dismiss the case at Docket 27 and motion to lift the stay at Docket 28.

I will return to this sole objector, which is a kind of group of primarily US investors holding primarily US bonds complaining about a US filing after I go through the slides.

But now is probably a good time, Your Honor, to turn to the slides and the history of the business and the pre-petition negotiations.

And if the Court could designate my colleague, Tadell Isgander (phonetic), with the go-to-screen sharing privileges, we can broadcast the slides so everybody can see them.

THE COURT:  Okay.

(Pause in the proceeding.)

MR. DUNNE:  I'm trying to see if I can -- oh, you've done it.  I'll just wait for the slides to come up.

(Pause in the proceeding.)

MR. DUNNE:  Okay, I see they're up.  We're going to skip over a few of the first slides because I've covered them.  I think we go to Slide 7.

(Pause in the proceeding.)

MR. DUNNE:  This is an overview of the business of Intrum, Your Honor.  And Intrum is an international credit management servicing and debt collection company.  It's headquartered in Sweden and operates internationally.

The company serves more than 80,000 clients across approximately 20 countries and employs approximately 10,000 people.

Intrum AB is a public company.  It's listed on NASDAQ Stockholm.  The largest 25 banks in Europe are our clients.  And the company part operates in a regulated industry.

Let's turn to Slide 8.

And this shows the two principal business lines of the company, Your Honor.  One is servicing, the other is investing.

In its servicing business, the company provides credit management services that are focused on late payment

and debt collection for specific companies.  The company tailors its debt collection strategy to maximize recovery from loans or other overdue receivables for clients who out-source their debt collection function to Intrum.

The company's investing segment, however, focuses on purchasing portfolio of secured notes, secured loans, as well as other over-due receivables from third parties at a discount.  The company generally then services it themselves, using it's in-house debt collection operation.

Slide 9, Your Honor, is a very simplified corporate structure chart, which I'll go to in a second.  I say simplified because there are 134 entities in the corporate family.  So most of the them are captured by the other subsidiary boxes at the bottom.  But these are the relevant ones for our purposes today.

The two gold star boxes are the two Debtor entities. Intrum AB and it's Texas affiliate, Intrum AB of Texas, LLC. The Texas, LLC, as you'll see, is shaded blue.  It is an obligor on all the debt for borrowed money secured and unsecured.

You'll see there are four shaded boxes that are gray.  And those are only guarantors of the secured debt, the revolving credit facility and the first lien term loan.

To get a little more granular on the capital structure, let's turn to Slide 10.

This slide, Your Honor, shows the Debtor's total debt obligations amounting to $4.65 billion.  This is the debt for borrowed money page.

The Debtor's funded debt can be broken down into a few buckets.  First, you have the RC App, the revolving credit facility of $1.116 billion.  And second, you have a term loan, a first lien term loan of $95 million.

And then you have a number of issuances of unsecured bonds.  The SUN's are senior unsecured notes.  They're governed by US law.  The privately placed notes in a small amount also US law and then you have the NTN, the medium term notes, that are governed by Swedish law.

And they aggregate -- and most of them are in the SUN to $3.445 billion of unsecured debt in the bond class.

This chart, Your Honor, also demonstrates how all the bond debt is governed by either US law or Swedish law.  And as I said at the outset, this fact is one of the reasons why we are running two processes, one will be in Sweden and one currently in the United States.

Turning to Slide 11, I covered that at the outset.

Let's go to Slide 12.

Slide 12, Your Honor, illustrates the benefit to the company of the proposed pre-packaged Plan of Reorganization.  And the accommodating improvement to the company's financial health that it will effectuate.  The bar graph on Slide 12 in

the blue bars, shows the current maturities under the pre-petition capital structure.

It can readily be contrasted with the maturity stack of the company if the pre-packaged plan is confirmed. The proforma maturity schedule is shown in the gray bar. The maturity extension achieved is about two years for each. But the nix of payments, as you can see, has also changed with fewer dollars coming due in the first couple of maturities under the revised capital structure than under the pre-petition one.

Your Honor, let's turn to Slide 14 and discuss the events that led to this Chapter 11 case.

Your Honor, over the past several years, the company grew larger and increased its scale by raising gross capital from the bond market and the billion of dollars in bond debt that we have today.

This capital allowed the company to invest in additional receivables. But unfortunately, since making those investments, the macro economic environment has soured. High rate of inflation negatively impacted the company.

Indeed, the credit management services industry as a whole has been negatively impacted by the macro economic conditions and correspondingly reduced access to capital markets owing to a decreased appetite from investors.

Combined with the slowing European economy, the

collectability of Intrum's portfolio degraded.  And I want to just put this into perspective with kind of one comment.

We can look at what's called stage two loans.  Stage two loans occur when credit risks have increased significantly.  And given all the factors I just picked through, the number of stage two loans was approximately 60 percent higher in 2023 than it was in 2019 before all those macro economic changes occurred and unfortunately persisted.

As a response to this pressure, Your Honor, Intrum embarked on an initiative that the company named a capital light business, moving away, as it sounds, from balance sheet investments and pivoting more towards the company's servicing segment.

Let's talk about a sale earlier this year and Slide 15.

Looking to decrease its debt, the company in January of 2024 announced the sale of a significant portfolio assets to Servris for approximately 98 percent of book value and to use the net proceeds from that sale to reduce the debt of the company.

Unfortunately, the markets did not react well to this announcement.  After the announcement of the sale to Servris and following Intrum's earnings call during which it announced that 24 EBITDA had decreased, Intrum share price dropped significantly and perhaps more relevantly, the rating

agencies downgraded the company's rating as well as the debt ratings on this bond.

The Slide 16 shows this volatility in visual form. This is the volatility that occurred post the sale to Servris and it led to market speculation about the company's ability to repay its debts as they come due.

By February of this year, it became clear to the company that a significant de-leveraging was required and they needed to find a solution to manage its overwhelming upcoming debt maturity.

As I noted earlier, Intrum was facing over 3.4 billion of debt liabilities coming due in 2025 and 2026 alone.  A restructuring, Your Honor, was inevitable.

I think we can skip over Slide 17, and let's go to Slide 18, which is a timeline of the pre-petition negotiations.  But I want to talk a little bit about this in detail.

In March, Your Honor, the company commenced a review of its debt capital structure and reached out to bondholders to start a dialogue, a negotiation to extend the company's maturity profile.

Two groups of bondholders formed.  We talked about them already.  There was a large majority group of bondholders represented by Latham and a smaller minority group represented by then solely by Weil and currently by Weil and Quinn

Emmanuel.

During the spring and summer of this year, the company negotiated with both groups. The minority group, the Weil group was focused on principally pursuing a potential up-tiering transaction that would have tried to refinance the near term notes, but did not address the remainder of the capital structure.

The Latham group was open to a conversation about a more comprehensive *pari passue* transaction with a new money component that could be used to repurchase notes at a discount.

That broad holistic solution, Your Honor, which extended maturities across all note issuances, was more beneficial to the company. And on July 10th of this year, Intrum entered into the first Lock-up Agreement with the Latham group.

Thereafter, we continued to engage in regular negotiations with a group of the RCF lenders hoping to obtain their consent and roll them into the Lock-up Agreement and that was successful.

The Lock-up Agreement was amended and restated on August 15th to bring the RCF into the fold. After finalizing, executing that amended Lock-up Agreement, the company continued to seek the support of additional creditors, including the Weil group.

Ultimately we had over 97 percent of the RCF and over two-thirds in dollar amounts of the notes signed up to the Lock-up Agreement and the Board determined that a pre-packaged Plan and the Swedish process were the best implementation options.

The company commenced solicitations on the Plan before Your Honor on October 15th.

Let's turn to Slide 19, which shows the tallies of the votes obtained in that solicitation process.

Again, a rousing success, Your Honor.  A hundred percent in dollar amount and number of voting RCF creditors voted in favor of the Plan.

And for the unsecured notes, it was 95 percent in number and 82 percent in dollar amount of those voting.

Skipping over Slide 20, that brings us to Slide 21, which is the terms of the Plan of Reorganization.

Well obviously, Your Honor, this will be set for a separate confirmation hearing and we'll walk you through it in detail then.  Let me just provide a high-level overview of the structure and key component of the Reorganization Plan.

We have two impaired classes, both of which are now impaired accepting classes:  The secured revolving credit facility and the unsecured bond class.  The RCF will be amended to provide an approximately two-year extension of the RCF maturity to June 30th, 2028 in exchange for certain fees,

21

economic changes and an enhanced collateral package.

The first lien term loan is being reinstated and it's unimpaired and obviously did not go.  With respect to the unsecured bond class, all existing bonds will receive a strip of exactly the same considerations.  They will get the same basket of new debt and equity.

First, they will receive a series of new bonds -- now no longer unsecured, but secured with the second lien. They will exchange at a 10 percent discount to face value and with staggered maturities from 2027 to 2030.

Again, this is approximately a two-year extension of the current maturity profile, which was 2025 to 2028.

In addition, Your Honor, and outside of the Plan, the class of bondholders will receive 10 percent of the equity of Reorganized Intrum.  All Noteholders will also be afforded the opportunity to subscribe to their pro rata share of the $573 million rights offering of new secured notes.  The proceeds of which will be utilized to repurchase exchange notes at a discount following the effective date.  General unsecured claims are unimpaired.

I just want to put a finer point on one thing, Your Honor, which is that the 10 percent equity issuance being distributed to the unsecured bondholders is not being effectuated through the Plan or before or through an order of the Court.  But instead will be authorized at a shareholders

meeting in accordance with Swedish law.

We believe, Your Honor, this Plan will not only stabilize the Debtor's business in the short term, but will set it up to operate successfully for years to come and remain competitive in the industry.

Turning to Slide 22.

Your Honor, we have filed a scheduling motion which is set to be heard later in this hearing, so I'm not going to spend a lot of time on this Slide, but Slide 22 sets out the proposed schedule for voting, solicitation, objection and a confirmation hearing.

It is imperative for reasons that we'll delve into when we get to the motions, for the company to move as expeditiously as possible through the Chapter 11 process.

Your Honor, that takes us through the Slides.

But before we turn to either the motions or other parties who may want to deliver preliminary remarks, I just -- I wanted to spend a couple of minutes on the remaining objecting party.

The Weil group or the Weil-Quinn group is a small dissentient subset of the overall large accepting class of unsecured bondholders.  We should not lose site of that.

The group holds about 15 percent of the unsecured bonds, 12 percent if you combine the debt classes who are voting on the Plan.  They have filed a motion to dismiss the

case.

For purposes of today, Your Honor, I'm not going to get into the legal merits or argue.  That's for another day.  It's not -- whenever Your Honor sets that for oral argument.

And I understand from Quinn, they don't intend to argue it today either.  But I had intended to discuss their involvement because they've been part of the process for months even before they had filed the motion.

So I'm going to limit myself to the next minute to that history and those facts and we can leave this motion for another day.

Your Honor, the Weil-Quinn group, they're not strangers to these cases.  They were intimately involved in the pre-petition negotiations.  Indeed, as you'll hear at the appropriate time, you know, had we managed to reach agreement on a settlement of some quantum of additional economics to provide to them, they would be supporting this Plan.  And they'd be on the other side of the jurisdictional and related issues they now trumpet.

And there's two points to bear in mind with this:

First, they're not acting as some consultant to the Court, some free roving protector of principals of bankruptcy law.  As it's almost always the case, Your Honor, it is about economics.  They didn't get the economics they craved, so they are prepared to try to dismiss the case.

They are prepared to try to up-end the deal the company struck with the overwhelming majority of bondholders. And in the process impair and degrade the company's value.

Second, and this is my last point, Your Honor, it is important to underscore what the minority group has always sought. They sought a non-pro rata deal. They wanted to do better than the other holders because they had the near term maturities.

They sought better treatment for themselves at the expense of holders who are currently of identical rank and priority. We respect that fundamental cornerstone of the Bankruptcy Code. In our Plan, we treat similarly situated creditors equally.

The Weil-Quinn group wish to, and frankly probably would have preferred, that we not file the Chapter 11 case and just try to scratch the pennies out of the couch cushions to pay their near term bond maturities when due.

And if we could have figured out some way to pay it and then would not have cared what happened thereafter with the remaining maturity. If we crashed into a liquidity wall shortly after paying them, they would have been unaffected by it.

But other similarly situated creditors would have been gravely affected by it. Here the company took a holistic view of its duties of the financial condition of the company

and analyzed the best comprehensive path forward.

The ratings down graded earlier this year and persistent macro economic pressured impelled the company to address its balance sheet and its coming maturities now. Waiting was not a prudent or reasonable option.

So much so, that the company and management should be commended here for not waiting to do the right thing, commended for not preferring one bond over others, and for not driving liquidity to near zero in the process.

So Weil's group's efforts to dismiss the case or lift the stay -- which we'll argue about another day -- is simply an attempt to stand in the gears and shouldn't be countenant.

Here, Your Honor, we are dealing with a pre-packaged plan that has already been negotiated, already voted on and already has broad base support of the creditors.

In addition, we are dealing with a foreign issuer who issued bonds under New York law.  Indeed, those New York bonds are the vary bonds that the Weil-Quinn group holds.  So it should come at no surprise to them, a group of predominantly US hedge funds that we seek a Chapter 11 to implement the deal struck with the majority of the holders of the US bonds.

And with that, Your Honor, unless Your Honor has any questions, I know Mr. Finestone of the Quinn firm and there

are others that would like to say a view brief words.

After he finished that, Mr. Leblanc will offer into evidence the First Day Declaration of Andrés Rubio, Intrum's CEO, who's also our witness for today, and Mr. Leblanc will shepherd us through the remaining Agenda.

THE COURT:  Thank you very much.

Maybe let me just hear from folks who are kind of supporting this and then Mr. Finestone, I'll turn to you, give you an opportunity to speak.

So I'll just go in the order of the boxes in which I see them.  This no rhythm or reason to this.

Mr. Persons, let me just see if you wish to be heard at this time.

(Pause in the proceeding.)

THE COURT:  I may have already unmuted you, Mr. Persons.  I think I can hear you.  Hold on a second.

MR. PERSONS:  Okay, thank you, Your Honor.

THE COURT:  Okay.

MR. PERSONS:  For the Record Charles Persons of Paul Hastings on behalf of Arini Capital Management.  And we are the largest unsecured bondholders, although not part of either the Quinn group or the Latham group.

I do want to echo Mr. Dunne's statements.  We believe this is a simple Chapter 11 with overwhelming support from the impaired creditor classes, including my client Arini

27

Capital Management is the largest unsecured Noteholders.

Arini has been involved in negotiations with the company and its advisors from day one when they were signatories for Lock-up Agreement.  We believe these cases were filed in good faith.  And we believe it is appropriately before Your Honor notwithstanding the arguments made by the Quinn and Weil teams.

We believe the pre-packaged plan is in the best interest of the creditors and the affirmative vote of the impaired classes bear that out.

We further believe the proposed transactions represent the best long-term solution for this company's current stress situation, and therefore request the Court move these cases forward expeditiously towards the confirmation that the Debtors seek and that a statutory majority of the impaired creditors wish for, as well.

Thank you, Your Honor.

THE COURT:  Thank you.

Mr. Goldberg, I don't know -- I guess you'll tell me which side you're on, as I get more and more familiar where we are.

MR. GOLDBERG:  Your Honor, if you can hear me I'm on a 212 number.

THE COURT:  I can hear you just fine.

MR. GOLDBERG:  Thank you, Your Honor.  For the

Record Adam Goldberg of Latham Watkins on behalf of the Note Ad Hoc Group or the Noteholder group.

I'm joined today by my partner, Rom Maleonic (phonetic) and Betsy Marks, and my colleagues, Debesa, Ryan, Rosen, and Thomas Sebarra (phonetic)a.

The Noteholder Group holds over $800 million of the senior unsecured notes and medium term notes which represent over 25 percent of the unsecured notes in the class.

The Noteholder group, as Mr. Dunne explained, has been the lead negotiating parties with the company for restructuring of the notes of this organization of March of this year.

The Noteholder group lead the negotiation of the Lock-up Agreement, which was initially signed in July and restated in August.  Now holders of over 70 percent of the notes have joined the Lock-up Agreement to support the restructuring before you now.

Mr. Dunne explained the financial distress that was -- lead to the needs for the Debtors to restructure here, Your Honor.  I won't retread that ground.  But I would like to point out that the market very clearly reflected the need for a restructuring here when the Debtors bonds traded at 50 and that was shown on page 16 of the Debtor's presentation in the trading record of the bond.

And now when you look at the results before the

Court of all these negotiations with the Debtors process here, to put it simply, Your Honor, my clients and the other Noteholders who voted in favor of this restructuring ultimately amounted to over $2.3 billion of funded debt, 82 percent by value and 95 percent by number of those voting -- would not have agreed to a 10 percent haircut of their principal and an extension of the maturity of their bonds, while leaving equity intact if they did not believe the Debtors really needed a financial restructuring and could not pay their notes when they come due.

Any suggestion that the Debtors should have paid their financial debts or could have accessed capital markets when their debts were trading in the 50s, is simply not credible.

For that reason, Your Honor, it is legal and appropriate for the Court -- for this case to be before the Court today.  The 2025 group's motion simply fails to address the full picture of this case.

The Debtors -- both Debtors here are obligated on over $3 billion of funded debt governed by New York law that includes its submission to jurisdiction in New York.  The Debtors access US Capital markets for the majority of their funded debt and it's entirely keeping with the Bankruptcy Code, and International comity, as well as creditor expectations, that they would come back here to the United

States to restructure their debt.

The Debtors plan to proceed with the Swedish process to ensure that the outcome of this proceeding is enforceable in Sweden does not undermine or minimize the importance of this process at all, and it's entirely consistent with creditor expectations based on among other things, the SAS case that Mr. Dunne mentioned.

In our view the 2025 group is simply nothing more than a disgruntled suitor.  They themself have acknowledged the reality of the Debtor's need for a financial restructuring when they proposed an aggressive up-tiering liability management transaction for the exclusive benefit of their bonds as described in the First Day Declaration and Mr. Dunne's remarks.

The Debtor should be complimented for turning down for what have amounted to lender-on-lender violence for the benefit of a minority substantive, their Noteholders, or alternatively pursuing a kick-the-can strategy.

Instead, the company was forthright in recognizing their financial distress, in working with the Noteholders towards a *pari passu* transaction embodied in the Plan that treats all Noteholders with equal dignity and affords all the same opportunity to join in the restructuring on the same terms.

The 2025 group's request to dismiss these Chapter 11

cases is, as Mr. Dunne explained, simply a transparent effort to generate hold-up value and does not make any serious proposal to present a restructuring or consider the interest of the estate and creditors as a whole.

To put a fine point on it, Your Honor, the Chapter 11 cases have resulted in the automatic acceleration of the Debtor's financial debts, pursuant to its indentures and credit agreements.  It is both stunning and telling that the 2025 group makes such an extraordinary request that to dismiss these pre-packaged Chapter 11 cases supported by the overwhelming majority of creditors and yet offers no proposal whatsoever that would address the aftermath of dismissing these Chapter 11 cases.

We look forward to the opportunity to adjudicate the 2025 group's motion and seek confirmation of the Plan at the earliest opportunity.

Thank you, Your Honor.

THE COURT:  Thank you.

Let's see.  Ms. Fink, have I unmuted your line?  I wanted to make sure you had an opportunity to speak and then I'll turn to Mr. Finestone and Mr. Porter and then Mr. Ruff.

MS. FINK:  Thank you, Your Honor.  Can you hear me okay?

THE COURT:  Just fine, good afternoon.

MS. FINK:  Good afternoon, again, Your Honor.  For

the Record Maja Fink of Clifford Chance, LLC on behalf of the RCF Steerco Group.  Sorry my raised hand doesn't seem to work earlier.

It's good to be here and, as the Debtor's counsel said, we really appreciate your time late on a Monday afternoon.  I'll be very brief.

The RCF Steerco group represents approximately 76 percent in amounts of both commitments under the RCF.  The Debtor's counsel noted and as evidenced by the high level of support for the Lock-up agreement and the Chapter 11 Plan, the RCF Steerco group and other RCF lenders support this restructuring.

In fact, I've noted 100 percent by principal amount of voting claims under the RCF voted to accept the Plan.  But what makes the RCF Lender's support particularly beneficial and important is that it's not only imperative for a Plan confirmation perspective, but more practically for continued operation of the company.

As is described in the various motions that are in front of you today, Your Honor, certain of the RCF lenders also provide vital cash management and related services for the company and have agreed to continue to do so, subject to Your Honor approving the related relief that the Debtors are requesting today.

In addition to agreeing to continue providing this

services, as you might be aware from the papers, the critical restructuring clients, the RCF Lenders have agreed to, is extending the maturity on the R6 facility.  Again, this was noted earlier.

Notably and assuming that the deal is implemented as we agreed, the RCF lenders are not asking at this time for default interest or to allow their facility.  So long as these cases stay on track, we will continue to support the company, but should really be mostly passive participants in these bankruptcy cases.

Now, as the challenges to the restructuring, the Debtors have received the requisite level of support to confirm the plan under the Bankruptcy Code.  We believe that the challenges should not derail the Debtor's restructuring efforts or delay the proposed confirmation timing.

Thank you, Your Honor.

THE COURT:  Thank you.

All right, Mr. Finestone, Mr. Porter, I will turn things over to your side.  Thank you for your patience.  Good afternoon.

MR. FINESTONE:  Thank you, Your Honor.  Once again, Ben Finestone and Chris Porter from the firm Quinn Emmanuel on behalf of the Ad Hoc Group of 2025 Noteholders.  Thank you for the opportunity to be heard.

Your Honor, we're going to be heard on a handful of

the motions today, and we'll reserve argument on that.  I think for purposes of this opening presentation, it does make sense to quickly summarize our fundamental positions here and our over-arching positions not just because Mr. Dunne and all the Plan proponents did it in their fashion, but because I do agree with Mr. Dunne at least about one thing and Mr. Dunne and his followers that this is a simple case.  Either we're right, Your Honor, and this case will be dismissed before we get to confirmation proceedings, or we'll have a contested confirmation hearing.  But that's probably it.  Those are probably the only two landmarks in this bankruptcy case.

And so our position on -- our position that was set forth in the Motion to Dismiss that we filed on the Docket, Your Honor, really is -- really is as fundamental as the Debtors plan to confirm a Plan here, Your Honor.

And Your Honor, just to quickly summarize it because it forms the basis for everything we'll state today on the other motions and it probably forms the basis for how this Chapter 11 case should be looked at, there's really three points that we make in our Motions to Dismiss, Your Honor.

Number one is that this Debtor isn't in financial distress.  Number two -- and it's not in financial distress in the sense that the Bankruptcy Code contemplates and I'll come back to that.

Number two, this -- Your Honor has seen other cases

in which there have been allegation of manufacturing venue in the Southern District of Texas. This case is not that, Your Honor. This is not the case that's headquartered in Delaware or headquartered in New York. Its manufacturing venue is in the Southern District of Texas.

This is a case that has nothing to do with the 50 states that we live in and so they're not just manufacturing venue, Your Honor, they're manufacturing eligibility under the Bankruptcy Code.

They're manufacturing jurisdiction under the Title 11, United States Code. These are pretty important principals, Your Honor, that all of my friends here think that can be just skipped over.

And third, Your Honor, their procedural Plan that they have served up to the Court does not respect international comity.

Your Honor, each one of these bases, we believe independently are sufficient to justify dismissal of these Chapter 11 cases. But when you put all three ingredients into a pot and you mix them up, we think that the conclusion is inescapable, Your Honor.

Let me just touch on financial distress first. Your Honor has modified contracts all the time. In fact, probably every confirmation order that Your Honor has approved has modified contracts. And the contracts I'm talking about, of

36

course, are contracts between the Debtor and some of their creditors.

Your Honor may do it so frequently that the Court -- a bankruptcy judge sometimes forgets what kind of -- how extraordinary debt power is to modify contracts.

In almost every other area of the law, when two parties enter into a contract, it's generally respected. And in fact the law is usually designed to figure out to enforce those contracts but not in bankruptcy and for good reason.

Bankruptcy judges like yourself have the power to modify. But that extraordinary power, Your Honor, is not just available for any corporation, even assuming that the Debtors here were legitimate US corporation -- which they're not -- it's not just available for any US corporation or any corporation to file a petition in an attempt to pay their creditors 10 percent less than what they owe them and improve their equity value.

There needs to be some bankruptcy concern. There needs to be some concern that one creditor is driving assets ahead of the other. There needs to be some concern -- some need to protect dismemberment of the Debtor's assets. That's what everything -- that's what bankruptcy is about.

It's not that here, Your Honor. And no matter what the professionals will say, we know what the witnesses who know have said this year in 2024. I'm talking about the CEO

and the CFO.

They didn't say it on US face, but they said it overseas.  There's no default here, Your Honor.  There's no liquidity issues.  There's no risk of employees running away.  This isn't a tort case where management is distracted because it has to defend itself against a plurality of litigation.

There's none of the unquestionably legitimate reasons to file for bankruptcy here.  It just doesn't -- it doesn't exist, Your Honor.

We heard Mr. Dunne go through some comments about how the European economy was subject to inflation and that the European economy slowed down.  And it hasn't been great for the business.

Your Honor, that's true about every European company that there is.  The fact that a company maybe not performing as well as it would like to perform does not mean that it's in financial distress.  It just means that things just aren't as good as maybe the CEO would like it to be.

It doesn't mean that they should file a petition and ask Your Honor to -- well, forget Your Honor for a second.  It doesn't mean that they should file a petition and trigger Congress's implementation of the automatic stay, Your Honor.

There's just no bankruptcy purpose here at all.  There's a $360 million market cap of equity and if we look at the Debtor's plan, that they're assuming is going to be

confirmed, equity is riding through subject to 10 percent dilution here, Your Honor.

So, that's point number one.  And we'll, of course, when the hearing on, there will be testimony from the Debtor's own officers, their own Chief Executive Officers, about how they recently said they either will have the cash to pay off impending maturities, for which there is no default, or they will be able to refinance that debt, Your Honor.

Point number two:  The manufactured eligibility. Because I don't -- it's not manufactured venue, Your Honor. It's manufactured eligibility.

Texas -- Intrum AB of Texas, it's only been -- I think it's only about two blocks away from where Your Honor is sitting.  And it's only been -- 801 Travis Street, Your Honor. It's been there for about a month.

I don't know if any humans have entered the building.  There are no human employees.  There are no human employees at Intrum AB of Texas, Your Honor.

There are no operations.  It certainly doesn't do what Mr. Dunne said these Debtors do.  It doesn't invest in a portfolio of loans that they could seek to collect and generate more than what they've paid to purchase.  It doesn't do that.

It doesn't service other entities.  It does nothing, Your Honor.  It does nothing but accept the deposit of cash so

that a bankruptcy case could be filed.  And again, this isn't the Southern District of Texas thing.  It's the United States of America thing.  Because I think that's the only property, however -- we're going to find out in cross-examination, Your Honor, but I think the only property in the United States is some cash that they deposited within the last four months to trigger the ability to use the United States Code, Your Honor.

And final comment:  Your Honor, I don't know for sure why they filed these cases.  I really don't.  They're filing Swedish Reorganization afterwards as a Swedish Domesticated Swedish Corporation.

There's no doubt that they have to file a Swedish bankruptcy.  It's assuming there's any need for any bankruptcy because that's where the operations are.  If you assume our *arguendo* that the company needs the protection of some insolvency proceeding, it's not here in America.  It's in 22 countries around the globe other than America.

So I don't understand why they filed here.  I think the Disclosure Statement gave me a clue because the Disclosure Statement says they are concerned that they couldn't get what they're going to ask Your Honor to confirm.  They're concerned they couldn't get it confirmed by a Swedish judge.

And so they're asking Your Honor to enter a confirmation order on an extremely accelerated timeline.  They're then going to take it to the Swedish Court and say you

see what Judge Lopez did.  Judge Lopez is a judge in the Southern District of Texas.  They know more about bankruptcy than you do, Swedish judge.  And because he approved it, you should approve it.

And, Your Honor, there's some advocacy force to a Judge Lopez order from the Southern District of Texas.  There's -- I respect this court as much as any court in the United States.

So I get the strategy of it, but I don't think it respects the court that you actually sit in.  I don't think this court should enter orders to assist -- to assist private parties in taking that order over to a foreign country to try and convince a foreign judge to do something that the private party is uncertain whether that foreign judge would actually do.

And it's actually worse than that, Your Honor because we filed a Foreign Law Declaration today.  What our Swedish lawyers tell us is that, assuming Your Honor does enter that confirmation order, it won't even have -- the Swedish courts aren't even going to give Your Honor's order full faith and credit.

So at most it will be like a persuasive authority, a legal treatus that they can submit to the Swedish judge.  I don't think that's a good use of the United States resources. I don't think it's a good use of Your Honor's time.

And just one last point on this international comity, Your Honor.  It's not just that they want an order from Your Honor to use what we called in our papers as a magistrate order to take over to the Swedish court and attempt to convince the Swedish judge to do what Judge Lopez said to do.

It's actually worse because they're also asking Your Honor to enter -- when Your Honor does enter the hypothetical confirmation order, imbedded in that hypothetical confirmation order is that no parties -- no creditors of these Debtors should be allowed to be heard and object at the Swedish Restructure.

And so, they want Your Honor to enter an order that won't have full faith and credit in Sweden and that will not only not be given full faith and credit, but will tilt this -- will basically tilt the scales on the adversarial process all in the court where they should have filed in the first place, Your Honor.

That's the summary of the motion.  It's where we're coming from in this case.  I'm going to just -- one last point because all of the parties before me couldn't help but just trumpeting the votes and the votes and the votes.

And I could see why Your Honor might be thinking what is different about Mr. Finestone and Mr. Porter's claim? Why aren't they -- legalities aside, because that's certainly

what all the other lawyers here did today.  They put legalities aside.  They think jurisdiction shouldn't matter. They think eligibility under the Bankruptcy Code shouldn't matter because they got the votes.

As a human, Your Honor, I wouldn't be surprised if Your Honor is wondering why my clients voted this Plan down or don't support this Plan, Your Honor.

And there's a very practical answer to that.  My clients do own the near-dated maturity funds.  They do expect to be paid what they are owed, representative of the amount of credit that they extended to the Debtor.  This company shouldn't be in bankruptcy.

What this Debtor did to get the votes and to allow the -- to formulate this Plan, it reached out to the lenders, the bondholders who owed the far dated maturities, some four, five years out.

And those bondholders were of larger size than my clients, who hold the near dated maturities.

And the Debtor went out to these far dated maturities and said, hey, would you agree to take a 90 percent -- take a 10 percent haircut?  I'll give you 10 percent stock. And all you have to do -- and let my equity ride through.

And why would those two parties ever agree to that deal, Your Honor?  The reason they can agree to that deal is because they're taking value from my clients to expect to get

paid in par next year, in 2025.  And this financially healthy company could do it.

And I just want to lay that out.  There's a lot -- there's a lot there.  I think the legalities matter.  But the main thing is that the why.  This Debtor, clever professionals, Your Honor, have taken value from my clients and basically transferred it to the clients who voted in favor of this Plan.  None of it really matters, Your Honor, because I don't think there's jurisdiction under the Code.  And I think these cases should be dismissed.

And with that, thank you for the opportunity to give opening comments.  And I'll just reserve until the objections are presented that I wanted to object to, Your Honor.

THE COURT:  Thank you.

Mr. Ruff, I'm just going around the box here.  Just making sure if you wish to address the Court.

MR. RUFF:  Yeah, just very briefly, Your Honor.  Thank you.  Jayson Ruff for the U.S. Trustee's office.

Your Honor, I'll reserve rights on any sort of dismissal or anything related to Plan Confirmation for when those matters actually come up for Your Honor.

I am pleased to report to the Court that I believe we were able to work through substantially all of our issues prior to today's hearing as far as with the matters that are before Your Honor today.

I think there is maybe perhaps one minor issue open but we can take it up when Your Honor gets to the motion on the solicitation process.

THE COURT:  Okay.

Okay, I think I've covered everyone.

Mr. Dunne, who should I turn this over to?

MR. DUNNE:  Your Honor, if I could have 30 seconds just to -- I just want to make sure that there's no misunderstanding about what we're trying to attempt here because there was some really extreme comments there, which is, Your Honor, nothing that we've done in this case with respect to jurisdiction doesn't comport with the case law that is found property in the United States to be sufficient as a jurisdictional predicate for commencing Chapter 11 cases.

And in this case, I might, frankly, in *Scandinavian Airline,* there's actually U.S. issued bonds here.  We came to the U.S. not to play some games -- and Mr. Finestone is more clever than I am because I didn't actually see this argument coming.

To play some games vis-à-vis how your Order will play in Sweden, Your Honor, we did it because we have New York governed bonds and we need a discharge here for U.S. holders that hold the U.S. bonds.  Full stop.

We'll figure out and we'll see what a Swedish court says with respect to the Swedish debt and we'll have to

address that at the time.

The other notion, Your Honor, that near term maturities are always entitled to more value. This is -- bankruptcy by definition, Your Honor, is thrust upon us. It's kind like what Hemingway said. You go bankrupt slowly and then all of a sudden. That there's a time, Your Honor, when events on the ground over swamp you and you're impelled to actually focus on a broad based restructuring.

And there's always the next maturity of bonds that finds themselves in the Chapter 11 and Chapter 11 is the great leveler of maturities. And that's where we are today.

You saw the unbelievable amount of dollars that were coming due in '25 and '26. They're north of 3 billion. And to say that we should have tried this, you know, May 5 of '25, maybe not the '26s. And by taking a holistic view we somehow did a DIP service to the near dated funds.

THE COURT: Mr. Dunne, --

MR. DUNNE: This is an argument that happens all the time, Your Honor.

THE COURT: I'm going to have to give Mr. Finestone -- we keep this going I'm going to have to give him a chance to respond. So I'm -- let's just turn to the First Day motions and let's just see where we go and take a date.

MR. DUNNE: I'm happy to do that, Your Honor. I'm

happy to do that.  I'll cede to Mr. Leblanc.

(Pause in the proceeding.)

MR. LEBLANC:  Good evening, Your Honor.  Andrew Leblanc, Milbank, on behalf of Intrum AB.

Your Honor, first, let me just ask because it's a new set up for us.  Can you hear and see me, Your Honor?

THE COURT:  Just fine.  Thank you.

MR. LEBLANC:  Okay.  Your Honor, I'm going to begin with the presentation of our evidence for today's hearing for all of the First Day Hearings.  And I'll introduce the Declaration of Mr. Rubio in just a moment.

And I know he was -- I saw him on the camera earlier.  I ask Mr. Rubio if he could turn his camera on at this point?

(Pause in the proceeding.)

MR. LEBLANC:  Great.  And it looks -- given that I could communicate that to him, it looks like he's able to hear us as well.

And I think, Your Honor, I assume you have not unmuted Mr. Rubio's line so I'd ask Mr. Rubio to press five star, which will allow the Court to unmute his line.

THE COURT:  I will do so.

I also note, Mr. Leblanc, just since we're here, there have been a number of pro hoc's that have filed.  We haven't gotten to them all.  But for purposes of today, no

need to ask me for permission to appear.  Any party -- all pro hocs should be considered granted for purposes of today's hearing.

I have unmuted a line.  Mr. Rubio, can you hear me okay?

MR. RUBIO:  I can, Judge.  Thank you.

THE COURT:  Thank you.  Perfect.

MR. LEBLANC:  Now, Your Honor, we filed Mr. Rubio's Declaration in support of the First Day -- the Chapter 11 petition and the First Day Motions at Docket Number 14.  That was filed yesterday on the Docket, Your Honor.

And we'd offer Mr. Rubio's Declaration as his direct testimony in connection with the First Day hearing.

THE COURT:  Any objection to the admission of the Rubio Declaration for purposes of today?

MR. FINESTONE:  Your Honor, Ben Finestone on behalf of the Ad Hoc of 2025s.  I was going to say provided it's for purposes of today, but Your Honor beat me to it.  No objection to the testimony coming in on paper subject to a short cross-examination, Your Honor.

THE COURT:  Okay.  Anyone else?

(No audible response.)

THE COURT:  Okay, the Declaration is admitted.

(ECF 14 - Declaration of André Rubio received in evidence.)

MR. LEBLANC:  Your Honor, then I would tender Mr. Rubio for cross-examination.  I will note, Your Honor, just in advance only because Mr. Finestone had discussed this is his opening remarks.

Obviously today is not the day to litigate their motion to dismiss.  I think he's even conceded that.  So while, you know, obviously there are a lot of facts that are laid out in the Declaration, we're going to pay close attention, Your Honor.  And I'll object and Your Honor will decide, Whether we've gone too far afield.  Obviously, the question that Mr. Finestone had previewed have nothing to do with anything of the First Day relief being sought here today.  And obviously this is being admitted solely for the purposes of the First Day.

So, I just wanted to make that point, Your Honor.  But obviously we'll make Mr. Rubio available for cross-examination and then we will respond.  But Your Honor should be prepared, if necessary, that we may have some objection as we go.

THE COURT:  Understood.

MR. FINESTONE:  And I'll be prepared to respond to relevance objections, Your Honor.

THE COURT:  Okay.  How do you want to do this?  Do you want -- why don't we take the -- is there a way we can kind of knock off some of the -- do you have an objection to

all of them, Mr. Finestone?  Or are there some you think -- do you want to cross him now or how do you?

MR. FINESTONE:  I will tell the -- I can tell Court which motions that I have objections to.  I do think that your Court, of course, Your Honor manages the Court's Docket and the proceedings today.

But I have a 10 to 15 minute cross.  I think it might be most efficient to get it out of the way.

THE COURT:  Okay.

MR. FINESTONE:  But I certainly could -- my easiest relevance response to Mr. Leblanc's objection is that they're seeking to have confirmation heard on like a fraction of the 28 days that the rules say.

So, we could do the cross then.  I think if we do cross now we can just finish with evidentiary portion today.

THE COURT:  Okay.  Let's do it.

MR. FINESTONE:  Okay.

THE COURT:  Mr. Rubio, let me just -- just so we have a clean record can you please -- your Declaration has been admitted.  I just -- just so we have a clean Record, can you raise your right hand?

(Mr. Rubio sworn.)

THE COURT:  Okay, you can put your hand down.

And the oath that you took, you understand is the same that you would take if you were live in the courtroom

with me?

THE WITNESS:  Yes.

THE COURT:  Okay, and just since we proceeding virtually can you just tell me who, if anyone, is in the room with you?

THE WITNESS:  No one.  I am alone, Your Honor.

THE COURT:  Okay.  And can you just -- I just ask that you put aside any notes or any the information that you have.  You're only just to answer the questions that are presented to you and if you hear parties object, just please give me an opportunity to resolve the objection.  Okay?

THE WITNESS:  Okay.

THE COURT:  Okay, Mr. Finestone, are you conducting this?

MR. FINESTONE:  Yes, Your Honor.

THE COURT:  Okay.  You may proceed.

MR. FINESTONE:  The only administrative question I had, Your Honor, and we may not need it if there's no need to impeach the witness.

But if there is, could I ask that my colleague, Ms. Taytas, T-A-Y-T-A-S, be entrusted with the ability to put a document on the screen?

THE COURT:  Can you repeat the name?

MR. FINESTONE:  Yes, Joanna and the last name is Taytas, T-A-Y-T-A-S.

THE COURT: Oh, yeah. Yep, I found her. Yep, you got it.

MR. FINESTONE: Thank you, Your Honor.

THE COURT: And I'm going make you the presenter. You just kind of operate if you need to and I'll take it back at the end of the presentation.

Okay, she's the presenter.

MR. FINESTONE: Thank you, Judge.

CROSS-EXAMINATION

BY MR. FINESTONE:

Q    Good afternoon, Mr. Rubio.

A    Good afternoon.

Q    The Debtors filed two voluntary petitions in this Court; isn't that right, sir?

A    Yes.

Q    And you filed -- and you signed both of them, correct?

A    Yes.

Q    You filed one for an entity called Intrum AB, correct?

A    Yes.

Q    And you filed one for an entity called Intrum AB of Texas, correct?

A    Yes.

Q    If I refer to the Intrum AB of Texas as "Intrum Texas," you'll know what I'm talking about, won't you?

A    Yes.

Q    And do you know the order that you filed these petitions in?

A    I do not.

Q    Okay.  Let me first ask you some questions about Intrum AB.  You are the -- you're the president and CEO of Intrum AB, are you not?

A    Yes.

Q    And the principal place of business of that entity is in Stockholm, correct?

A    We are headquartered in Stockholm.

Q    Okay.  Where is the principal place of business?

A    We operate across 22 countries in Europe.

Q    Do you have a place that you consider your center, your locus?

A    Sweden.

Q    Okay, thank you, sir.

     You have no employees in the United States, do you?  Intrum AB?

A    We do not.

Q    And you don't have any operations in the United States, do you?  Intrum AB.

     MR. LEBLANC:  Your Honor, I'll just interpose an objection at this point.  I don't believe that these questions are relevant to any issue that is before the Court in the First Day Motions.  I think it is entirely directed at the

Motion to Dismiss that all the parties have agreed are not being heard today.

MR. FINESTONE:  Your Honor, there's -- may I respond?

THE COURT:  Please.

MR. FINESTONE:  Yeah, there's not doubt, Your Honor, that there's overlap.  I don't disagree with Mr. Leblanc.  But there are two motions they're filing today.  One is to file a consolidated list of creditors in which they just listed creditors without regard to whether their creditors of Intrum AB Texas or Intrum AB.

I don't believe Intrum AB of Texas has any creditors.  And so we're objecting to that.

The second one, Your Honor, is they filed a motion seeking to waive completely their obligation under the Bankruptcy Code to which Schedules concerning Intrum AB of Texas' recent history.

Now they've only been alive for 30 days.  But -- and I suspect that those Schedules would be a complete blank slate.  No transfers in, no transfers out, because the entity was really created for no reason other than to get its foot in the door of this Court.

But the -- our thrust of both of those objections is that one entity exists and is only in Sweden.  And one entity exists in Texas and is manufacturing jurisdiction.  And this

very, very short cross elicits the factual distinctions between the two entities that if it were up to the Debtors would just be one ball of wax called Intrum.

THE COURT:  I'm considering this as kind of more of groundwork.  So I'll overrule the objection.  Continue.

I bet you probably need to ask the question again, though, so Mr. Rubio remembers what it was.

MR. FINESTONE:  Okay.

THE WITNESS:  Thank you.

MR. FINESTONE:  Okay, to the extent I'll withdraw the question.

BY MR. FINESTONE:

Q    We're talking about Intrum AB.  We're not yet at Intrum Texas, Mr. Rubio.  There are no operations in the United States, correct?

A    Correct.

Q    You're spread across 20, maybe 22 countries located in Europe; is that right?

A    Yes.

Q    And there's no real property in the United States; is there?

A    I don't know what you mean by property.

Q    Well I was being more precise than that.  Let me start first by real property.  Do you know what that term means, real property under U.S. -- in the U.S. meaning of the word?

A    If you explain it to me I can answer the question.

Q    Let me ask it differently.  Intrum AB, it doesn't own any land in the United States, does it?

A    No.

Q    And it doesn't own any tangible personal property either, like a sofa or a car?

A    No.

Q    Okay, thank you.

I'm going to switch to Intrum Texas now.  Intrum Texas is only been for about a month; is that right, Mr. Rubio?

A    Yes.

Q    And when you first created Intrum Texas, the first address it had was -- the first address it had was in Stockholm; is that right?

A    I'm not aware of that.

Q    Well, let me first say, are you -- do you have role as it relates to Intrum Texas?

A    I am CO of Intrum AB and I believe Intrum AB is the director of Intrum AB or Intrum Texas.

Q    Okay, so you are the human.  You are not the employee of Intrum Texas, correct?

A    I am not.

Q    And in fact, there are no employees of Intrum Texas; isn't that right, sir?

A    That's correct.

Q    Intrum Texas is not involved in your servicing line of business is it?

A    It is not.

Q    It is not involved in your portfolio investing line of business is it?

A    Other than as guarantor of our debt, no, it's not.

Q    Okay.  And there's isn't any third line of business that Intrum has created in the last month that I should know about, is there?

A    No, sir.

Q    What is -- what line of business is Intrum Texas involved in, sir?

A    Intrum AB is a guarantor across substantially all of our debt.

Q    Okay.  I understand that it may be obligated on debt. But what's its line of business?  How does it make money?  Not how does it pay people's debt.  What does it do to make money?

A    It is a subsidiary of our holding company.

Q    Okay.  Other than that, is there any business you can articulate for Intrum Texas?

A    No.

Q    And given that the only business that you can articulate is being obligated on -- well, let me first ask:  When did it become obligated in all of your debt?  It's only be alive for a month, so when did it become obligated in all of this debt?

A    Before we filed Chapter 11.

Q    Like in the last seven days or in the last three weeks?
Can you be more precise?  It's not that long of a time period.

A    In the last few weeks.

Q    Okay.  And did it get any -- did Intrum Texas get any
value for becoming a guarantor of that debt?  Or did it just
become a guarantor?

A    It became a guarantor.

Q    Does Intrum Texas have any assets at all?  We've spoken
about liability.  But does it have any assets?  Do you know
what that means assets?

A    Yes.  I believe it has cash in a bank account.

Q    Well how much cash does it have in the bank account?

A    $50,000.

Q    And how did it generate the $50,000 in the bank account?

A    We deposited it.

Q    Intrum AB deposited $50,000 into Intrum Texas' bank
account?

A    Correct.

Q    Why did you make that deposit?

A    To put money in Texas.

Q    Are you planning on purchasing some land in Texas?

A    We are not.

Q    Okay, so why would you want to put money into a bank
account -- why did you want to put money in Texas?

A     To capitalize Intrum AB of Texas.

Q     Why Texas, why not one of -- well, let me ask you this:
Why America?  Why did you put cash into an entity in America?
And is there any business purpose that you can articulate?  If
you can't just say, "I can't."

MR. LEBLANC:  Object to the form, Your Honor.

THE WITNESS:  I can't.

MR. LEBLANC:  There are a number of questions there.

And Your Honor, I'll just restate my objection.  If
we're going to litigate the motion to dismiss, I'm happy to
argue it today.  I just didn't think that was for here today.

THE COURT:  We're now probably into left field.  I
do sustain the objection.  It was compound.  But we ought to
kind of -- I don't know where this relates to any of the
motions now, though, Mr. Finestone.

MR. FINESTONE:  Well, I respect that, Your Honor.
And I also appreciate the difficulty the motions haven't been
presented.  So maybe Your Honor had a good idea.

Let me just wrap it up.  I've got five, 10 more
minutes, if that's okay.  And Mr. Leblanc can reserve
objections.

BY MR. FINESTONE:

Q     This, Mr. Rubio, this -- the proposed restructuring in
this Court, are you familiar with the terms of the proposed
Plan of Reorganization?

A     I am.

Q     Can you tell me why you filed bankruptcy in the United States of America prior to filing in Sweden?

A     We spent several months engaged with our creditors and then we signed a Lock-up Agreement to effect the recapitalization.  We evaluated several alternatives for implementation and we felt that Chapter 11 was the most sufficient process which would minimize the impact on the company.  And it would give the greatest amount of certainty, given the level of creditor support.

Q     Can you tell me why you haven't commenced a restructuring in Sweden?

A     Because again, when we evaluated the process in Sweden, as well as other jurisdictions including the United States, we felt that United States offered the greatest certainty and the greatest sufficiency.  And also the preponderance of our liabilities are in the U.S. law.

Q     Anything else you can say, Mr. Rubio, about why you're -- you have no assets to protect in the United States; is that correct?

A     We do not have assets in the United States, other than the bank account.

Q     Okay.  Let me ask you a different question.  Did you Mr. Dunne's comments when the hearing started, sir?

A     Yes.

Q    Did you hear him say -- he said several times that your bonds are U.S. issued?

A    I heard that they were under U.S. law.

Q    Right.  Some of them are governed by U.S. law.  Do you agree with me?

A    Correct.

Q    But none of them are U.S. issued; isn't that right, sir?

A    I don't believe.  I believe Intrum AB is the issuant.

Q    Yeah they're all issued -- they're all issued by Intrum AB, a Swedish company, correct?

A    A Swedish headquartered company, correct.

Q    And some of them are denominated in Euros; isn't that right?

A    Yes.

Q    Some of them are denominated in the Swedish currency, correct?

A    Yes.

Q    None of them are denominated in U.S. dollars; isn't that right, sir?

A    Correct.

Q    Have you ever been to the office of Intrum Texas in the last four weeks?

A    I have not.

Q    Has any human that works for Intrum AB been to that office?

MR. LEBLANC:  Your Honor, same objection.  Same objection as before.  I think we're so far afield of anything relevant.

THE COURT:  Mr. Finestone, what's the relevance of these question -- of that question?

MR. FINESTONE:  Your Honor, I'm just -- when we get to the Motion to -- when we get to the motion in which they're going to ask Your Honor's permission not to disclose anything about the financial -- the short lived financial history of Intrum Texas, I want Your Honor to see that there's reason for all creditors be focused on whether or not this entity is a real entity.

They have no operations whatsoever, which is what I suggest, or it is in fact a real company.

THE COURT:  Which motion are you referring to?  Are you --

MR. FINESTONE:  In the motion, Your Honor in the motion to -- motion seeking authority to have the confirmation hearing heard on --

THE COURT:  Oh, got it, got it, got it.  Okay.

MR. LEBLANC:  I think I've made my point.  I made my point.

Last two questions.

BY MR. FINESTONE:

Q    Mr. Rubio, do you plan on coming to America to help

prosecute these Chapter 11 cases?

A     If necessary, yes.

Q     Okay.  You'll come here to testify, will you not?

A     I will.

Q     Okay.

          MR. FINESTONE:  Nothing further, Your Honor.

          THE COURT:  Okay.  Mr. Leblanc, any examination?

          MR. LEBLANC:  Our next step I'll need to confer with my colleagues?

          THE COURT:  Absolutely.

     (Pause in the proceeding.)

          MR. LEBLANC:  Your Honor, we don't have any questions for Mr. Rubio.

          THE COURT:  Okay.  Let me just ask if anyone else has any questions for Mr. Rubio.  I'd ask that you please just either announce yourself or hit five star.

     (No audible response.)

          THE COURT:  Okay, Mr. Rubio, I'm going to let you off the virtual witness stand.

          Thank you very much for your time.

          THE WITNESS:  Thank you.

     (Witness steps off virtual witness stand.)

          THE COURT:  Okay.  Okay, Mr. LeBlanc?

          MR. LEBLANC:  Your Honor?  Yes, Your Honor. I would just say to the extent as we go through the motions we have a

need for Mr. Rubio's testimony.  Obviously he'll continue to be here even though I think we are -- we just passed midnight in where he is.

But I know he'll continue to be available for us if necessary.

THE COURT:  Okay.

MR. LEBLANC:  Your Honor, with the Court's indulgence, I would turn then to the scheduling -- I'm sorry, to the Agenda.  And we propose to begin our Agenda with the scheduling motion, which is filed at Docket Number 13, Your Honor.

THE COURT:  Okay.

MR. LEBLANC:  And, Your Honor, I'll handle this motion and then I'll turn it over to my colleagues to handle motions moving thereafter.

Your Honor, we filed a motion seeking to set a schedule that leads to a confirmation hearing on December 5th. Mr. Dunne has put out the full schedule, much of which has already occurred frankly.  It began with the solicitation starting on October 17th.  So we've been well underway in this process.

Now unlike many pre-packs, Your Honor, particularly pre-pack with the level of support that we find from our creditor body here and with the absence of any plans requested, we're not seeking a confirmation hearing within

64

hours of filing, but rather in the span of 20 days from the petition date, Your Honor.

So, Mr. Finestone had said it's a fraction of the full amount of time that the Bankruptcy Code provides.  It is a fraction.  It's seven/fifths  -- I'm sorry 5/7ths of the full amount of the time.  It's quite a bit way along the way in the spectrum.

When Your Honor knows that you see a lot of pre-packs, particularly with the level of sorts that are done in far less time than this.

We recognize and we knew coming in that we were going to have an objection from Mr. Finestone.  But we recognize at the same time that it is imperative for this company to be moved through this Chapter 11 process expeditiously.

As Mr. Finestone argued previous, Mr. Dunne talked about as well, our overall restructuring plan involves a number of different steps, the first one of which is to get to a confirmation order from Your Honor.  Thereafter, Your Honor, there's a process that it has to undergo in Sweden, that's the Swedish restructuring process which is primarily focused on the local Swedish creditors who may not be subject to US Court jurisdiction, and we'd have to do the shareholder voting that's necessary to distribute the 10 percent of the equity to the holders consistent with the terms of the agreed Lock-up.

Now we have in our Lock-up Agreement with the creditors, which again led to 100 percent support from the RCF holders, 83 -- 82 percent support from the unsecured noteholders, that Lock-up Agreement has an outside date for completion of these restructuring steps and going effective of May 31st, 2025.

When we work backwards from that, Your Honor, recognizing that we will have a Swedish process that runs after this process is completed, we believe it's imperative that we emerge from bankruptcy, from Chapter 11 as quickly as possible. And so we propose a schedule that has a confirmation hearing on December 5. Again, that's 20 days after the petition is filed, which we think is utterly appropriate in light of the overwhelming amount of support that we have for this Plan.

To the extent, Your Honor, we recognize that we're going to deal with the Quinn motion to dismiss, we are prepared to deal with that. I think Your Honor in the past has set concurrent hearings on confirmation and motions to dismiss. We think that makes good sense here. And we're prepared to brief that and address it on whatever schedule the Court orders to make sure that everybody's ready to go on December 5th on that schedule.

We're prepared to make production to Quinn Emanuel immediately. We can start tonight, we could start tomorrow

morning.  We also have an NDA that we'll propose to them which will lead to a protective order from the Court, but will make production to them as early as possible, even in the absence of having that subject of course to the usual professional eyes only restriction.

We'll work with them, Your Honor, to schedule depositions.  Mr. Rubio just was asked the question.  He, of course, is open to coming to the United States to facilitate those depositions.  Mr. Finestone and I are both on the East Coast, it's a shorter flight than Houston.  We'll be happy to accommodate him in our offices in New York and do the deposition on whatever schedule he requests to make that happen.

Now I think, Your Honor, the other reason that there's cause to -- for the relatively minimal reduction in the schedule that we're looking for relative to what the rules provide, is that this is not an instance where anything is being thrown together at the last minute.  Mr. Finestone's clients, admittedly represented by a different law firm, Mr. Finestone's clients have been involved in this process since early this year.

The parties have known it all, what the terms of this restructuring, what support it had, the nature of it, they've known about it for months.  And the Disclosure Statement itself has been out since October 17.  So there's no

surprises here in anything that's happening.

We can deal with whatever issues they want to litigate in that time frame, Your Honor, and we believe that's an appropriate time frame for a case like this, a pre-pack. And frankly, Your Honor, as I suggested, it may even be slow for a pre-pack. I've certainly been involved in ones that have lasted less than 24 hours. But we recognize this is a little different because we do have an objecting minority group. We'll deal with their objections and we think that time frame is utterly adequate.

So, Your Honor, we'd urge the Court to enter the schedule that we've proposed which includes the December 5 confirmation hearing and the dates leading up to it, Your Honor.

Happy to answer any questions that the Court has.

THE COURT: Thank you.

Mr. Finestone.

MR. FINESTONE: Thank you, Your Honor. Ben Finestone on behalf of the Ad Hoc Committee of 2025 Noteholders.

Your Honor, I agree with Mr. Leblanc, he needs to show cause under Rule 9006 in order to notice up a plan confirmation objection deadline less than 28 days and a plan confirmation hearing less than 28 days.

Your Honor, I sent Mr. Leblanc a letter, this is

Exhibit C in our Exhibit List, on October 29. And I probably did something that wasn't great from a litigation strategy perspective for my client. I laid out the entire argument, Your Honor. I told them why -- first of all, we sent this letter shortly after we saw the plan that they'd sent out (glitch in the audio).

I laid out the entire argument, and you don't usually want to give your adversaries the entire argument and give them an extra however long it was, three weeks, to plan how to beat me. And Mr. -- and I also in that letter, I not only laid out the substance, Your Honor, I'm completely forthright about it. I also requested some discovery.

Now I knew that there was no pending proceeding, I knew that Mr. Leblanc could ignore it if he wanted to ignore it, I had no ability to get an order from Your Honor forcing him to give me documents. But I said, why don't you give me some documents because I see the schedule that you're proposing and start giving me discovery now. I think you'll be happy if you do.

I didn't say that, Your Honor, but it's what I was thinking.

I think you'll be happy if you do. So then when you're asking Judge Lopez or Judge Perez, we didn't know who, Your Honor, to do a very aggressive schedule, you can tell him you've already given me discovery. And Mr. Leblanc sent me

back a letter, which I really -- again, I really respected from a litigation tactic perspective. I'm going to use it one day, Your Honor, loved it. He sent it back to me and it said, we don't think litigating via letter writing makes any sense, and we'll talk to you when we have to talk to you. And not even any response on discovery, not yes/no, he didn't even -- it wasn't even -- the request wasn't even respected.

So we've been trying, Your Honor. We're -- I don't want to litigate this just to delay it. These are important issues. We've been trying to get started. The Debtors, there may have been only one Debtor then, but the Debtor had no interest in doing it.

The other thing, Your Honor, is that they say they -- they commenced solicitation October 17, 2024, and the materials that they sent out to creditors then proposed a bankruptcy filing on this schedule, Your Honor, by November 17, that was yesterday, and then they proposed a December 15th objection deadline and a December 20th confirmation hearing. That's actually what they sent out to all the creditors.

That was far more reasonable than what they're doing now. I don't know why they decided to make it more of a jam on the objecting creditors than what they were comfortable sending out to all the creditors. And, Your Honor, this is Exhibit 7 on our Exhibit List. It's the solicitation

materials that they sent out.

Again, what they proposed to the public and the world was December 15th and December 20th. Now they've cited it's got to be basically two weeks sooner than that. We don't know why that happened, but it also shows that cause hasn't been established.

And then finally, Your Honor, they're basically saying that we need to get things moving because the Swedish restructuring proceeding might take a long time -- it might take a long time and the contract that we entered into with the long gated creditors has an outside deadline -- and forgive me, Mr. Leblanc, I don't know what the date is, but it's April or May or something like that -- and we need to get -- we need to get it done by then.

Well, Your Honor, if they were so worried about finishing the Swedish proceedings, then they should have just filed where they should have filed. They should have filed in Swedish, the could have filed a couple of weeks ago and the clock would be ticking and they'd be getting things done. It's only because they're coming here to get the advisory opinions that I described in the opening that is causing this time period before they even commence the Swedish proceeding.

So I don't -- I just don't think these proceedings should be pending, and they certainly shouldn't be a basis for cause because of their deadline to get the Swedish proceeding

done.  We think the cases should be dismissed.  If we fail at that, Your Honor, we're going to object to confirmation.  It's not going to be -- I will tell you this, Your Honor, it's not going to be buckshot approach, it's primarily going to be best interest of creditors and feasibility.  But I need opportunity to take discovery on that.  It's true, I don't need much discovery on my motion to dismiss.

I think what should happen here, Your Honor, there's no cause to shorten 28 days on confirmation, let's schedule our motion to dismiss as soon as Mr. Leblanc is ready to defend it and as soon as I get my depositions of the executives, and then let's do confirmation.

But they haven't established cause to depart from Rule 2002, Your Honor.  It's inconsistent with what they sent out to creditors and it's inconsistent with really -- and it's inconsistent with -- it's unfair to our attempt to get this thing started before they even filed the petition, Your Honor.

THE COURT:  So let me just share, maybe the Court's schedule might be the thing I can do.

I can't do the 5th or the 6th.  I think it's a little too tight anyway.  I think realistically I'd like to schedule both starting on December 16th, you know, at 1:00 p.m.  I'm going to have to move some stuff and I'll do it, and then we'll take all day on the 17th if we have to, the 16th and the 17th.  We can go really late on the 16th if you

want to.

I don't know, maybe we finish on that day, but we'll use the 17th as a back up on that day.  I just have a Chapter 13 panel, I can't move those, those are really important.  But I can do the 16th starting at 1:00.

Maybe we -- just then kind of dual track the motion to dismiss and plan confirmation on that day.  And then we can pick up on the 17th, I don't know, starting at 9:00 a.m. and just go till we're done.  But we'll have the 16th and the 17th.

The 18th, I can't do and the 19th and the 20th, I've got plan confirmation in another case on the 20th I just gave out like at noon today.  But I know I can do the 16th and the 17th.  It falls right at 28 days, but I'm comfortable with that.

But I do need the parties to meet and confer as quickly as possible to kind of start getting discovery out the door as quickly as possible and to start scheduling depositions because I know we're going to start running into inevitably Thanksgiving and all that stuff, and we ought to just plan it.  So those will be the days that I know I can do and so maybe we'll work with those days, and that does give -- that's Day 28, but I think it -- I think it works for my schedule.

MR. LEBLANC:  Your Honor, Andrew Leblanc on behalf

of Intrum.

Your Honor, we'll make those dates work obviously. We appreciate the Court's schedule is the most important consideration in all of this.  We can throw out whatever days we want to, but we'll make those days work.

We do look forward -- what Mr. Finestone's letters to me said is that the Ad Hoc Group intends on propounding discovery requests of Intrum.  We look forward to getting those, but we will not wait for those, Your Honor.  As I mentioned, we will be producing documents tonight or tomorrow morning, and then we look forward to negotiating an NDA, presenting it to Your Honor in a protective order.

Then we'll work with that schedule, Your Honor, and obviously we'll just move the interim dates out accordingly. And then we're happy to meet-and-confer with Mr. Finestone and Mr. Porter to negotiate a time for responses on motions to dismiss as well.

That's all fine, Your Honor.

THE COURT:  Okay.

MR. FINESTONE:  Your Honor --

THE COURT:  Mr. Finestone.

MR. FINESTONE:   -- a few small things.  Thank you, Your Honor.

First of all, just a logistic issue.  Mr. Porter was going to cross the witness, and I got -- I got too enthused

and I took his role, so can he be excused, Your Honor, and take his camera down?

THE COURT:  Absolutely.

MR. FINESTONE:  Sorry about that.

THE COURT:  Yeah, absolutely.  Mr. Porter, thank you very much for your time.

MR. FINESTONE:  And then if -- the other thing, Your Honor, I respect Your Honor's ruling obviously on the timing and can make those dates work, and we'll meet-and-confer with Mr. Leblanc, and also with the participating creditors we're going to serve discovery on them as well.  Not the RCFs, but the longer dated maturities.

So the date works.  I think you implicitly overruled my request to have my motion to dismiss heard earlier, but as I said, I understand.

THE COURT:  I think the Court's schedule just overruled you.  But I do think just holding them at the same time makes a lot of sense for me.  I'm going to -- I think a lot of these issues are going to overlap and I'm going to make the call one way or the other on that day.  Well --

MR. FINESTONE:  Thank you, Your Honor.

THE COURT:   -- I intend to listen --

MR. LEBLANC:  Your Honor --

THE COURT:   -- well, let me --

MR. LEBLANC:   -- if I may --

THE COURT:  -- let me make it clear, I intend to at a minimum just kind of hear, consider everything at the same time.  I don't -- when I rule I need to hear what I hear.  I don't know what I don't know yet, so I'll have a better sense as we get closer.

Mr. Leblanc --

MR. LEBLANC:  Your Honor --

THE COURT:  -- in terms of --

MR. LEBLANC:  Yes.

THE COURT:  -- kind of getting something, is that something I can tweak in the order, you would know better, does someone need to upload an --

MR. FINESTONE:  Oh, Your Honor, I'm sorry, can I interrupt --

THE COURT:  Yeah.

MR. FINESTONE:  -- the Court for one second?

THE COURT:  Yeah, I'm just talking about timing, I'm just talking about in terms of timing --

MR. FINESTONE:  Yes.  Okay.

THE COURT:  -- not anything else on this.

MR. FINESTONE:  Because you've got other stuff than the motions, too.

THE COURT:  Yeah.  No, no, no, you do.  I'm just talking about in terms of timing, I just -- keep these things in mind maybe is the better way of saying it, Mr. Leblanc,

because I -- you'll know better --

MR. LEBLANC: Your Honor, we'll --

THE COURT: -- if I can tweak something or if we can get other stuff in there. That's all.

MR. LEBLANC: Your Honor, I think we -- I think we can submit a form of order. We'll run it by Mr. Finestone with respect to these dates and we'll submit a new form of order for the Court. Because I don't -- with Your Honor's direction on the Record, I don't think it's critical that this order be entered today.

THE COURT: Okay.

MR. LEBLANC: So we can get a form of order that's agreed and get it uploaded --

THE COURT: Yeah.

MR. LEBLANC: -- for Your Honor to consider.

THE COURT: I didn't mean to short change anything, I just knew that that date would be best.

Mr. Finestone, let me hear from you, sir.

MR. FINESTONE: On the other issues, Your Honor?

THE COURT: Yes, sir.

MR. FINESTONE: Yes, the only other objection that I had to this motion was the Debtors are requesting a waiver of their obligation to issue Statements and Schedules with respect to both Debtors. And here's the -- my proposed compromise, Your Honor.

I will not object to what they're asking for as it relates to Intrum AB.

I do object to the waiver as it relates to Intrum AB of Texas, that's the entity that they just created.  And obviously Your Honor knows why I want the Schedules for that, because I want to see, or confirm that this entity does absolutely nothing.

But I also will say that it should be very, very easy for Mr. Leblanc to create those Schedules because the Debtor does absolutely nothing.

So I don't think that -- I think that's important evidence, it's an obligation under the Bankruptcy Code and the rules.  I'm being pretty good by not objecting as it relates to Intrum AB, but I'd like to have my Schedules as soon as possible with respect to this Debtor that they base eligibility and jurisdiction on, Your Honor.

THE COURT:  Mr. Leblanc, what's your response?

MR. LEBLANC:  Your Honor, my camera seems to have just gone off, but can you hear me still?

THE COURT:  I can hear you.

MR. LEBLANC:  Okay.  We're going to work to get the camera back up, I apologize, Your Honor.

THE COURT:  No worries.

MR. LEBLANC:  But -- oh, here it is, okay.

Your Honor, with respect to Intrum Texas, Intrum AB

78

of Texas, we can do that.  I think -- I'll talk to my colleagues, we can file Schedules with respect to that.

We had negotiated with Mr. Ruff a modification to what we proposed in the order, if we had 75 days -- if the plan is not confirmed, we agreed to him to move those days up to 60.

Again, if the plan is not confirmed, because obviously if the plan is confirmed on our schedule, then it doesn't -- it doesn't make any sense.

But I mean Mr. Finestone's going to get all that information in discovery in any event, but we can do the work to prepare those Schedules for Intrum AB of Texas, Your Honor.

THE COURT:  By the end of the week, Mr. Leblanc?

MR. LEBLANC:  Your Honor, there's no -- there's no motion to shorten time for us to file those Schedules.  I think the rules give us 14 days, so we don't -- we'll do it within the 14 days provided for by rule.

THE COURT:  I think 14 days is fine.  Let's just get me a revised order and let's get it on the Docket and I'll sign it.

MR. LEBLANC:  Thank you, Your Honor.

THE COURT:  Thank you.

Where do we go next?

MR. LEBLANC:  Your Honor, I would just --

UNIDENTIFIED SPEAKER:  I would just -- Your Honor --

MR. LEBLANC:  I'm sorry.

UNIDENTIFIED SPEAKER:  I would just request that Mr. Leblanc can just include me and copy me on any proposed deadlines and whatnot, just so I can be involved in that week.

MR. LEBLANC:  Your Honor, we'll absolutely do that, we'll make sure to do that.

THE COURT:  Thank you.

UNIDENTIFIED SPEAKER:  Thank you.

MR. LEBLANC:  And, Your Honor, if there are no questions -- no other questions on Topic Number 13, the scheduling order, I'm going to yield the virtual podium to my partner, Jamie Fedell, who's going to take the next motion.

THE COURT:  And I'll just note then for the Record then that the Court has considered the emergency motion for an order scheduling a combined hearing on adequacy of Disclosure Statement and Confirmation of the Plan, solicitation procedures, and subject to the dates set forth for the Court by the Court on -- for Plan Cconfirmation and the tweaks to the -- you know, with respect to the filing of the Schedules of Intrum AB of Texas I'm going to approve the proposed -- the other proposed form of order, all the other things included in the proposed form of order, I know that there may be some additional tweaks with some language there and I've got no issues with them.

Just get something on file and let my case manager

know and I'll sign it.

And I understand that you're going to -- before you file it, you're going to circulate it to the other parties. The only thing I would ask on this one, don't over-lawyer it. Just stick the dates in and make the tweak and get something to me, we all know what it's supposed to do.

And let's just get this going because I am -- I want to make sure this triggers notice and that's important to me from a noticing standpoint to a lot of folks, and I want to make sure that that Kroll gets to work as quickly as possible on this stuff.

MR. LEBLANC:  Understood, Your Honor.

THE COURT:  Thank you.

MR. LEBLANC:  We will do so.

THE COURT:  All right.  Mr. Fedell.

MR. LEBLANC:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. FEDELL:  Good evening, Your Honor.  Jamie Fedell, Milbank, on behalf of the Debtors.  Recognizing that in a slightly late proposed --

THE COURT:  I know, it's just -- we call this noon in Houston, this is good stuff.

(Laughter.)

MR. FEDELL:  Well, I'll try and move relatively quickly subject to (indiscernible) things Mr. Finestone or

others want to say on the motion.

The next item on our Agenda is the Debtor's motion to approve the Debtor's cash management system. That motion is filed at Docket Number 12. You know, usually we probably take the cash collateral motion first, but I think just some brief background on the cash management system will be helpful when we turn to the cash collateral motion so, but cash management is first on the Agenda.

And then you heard from Mr. Dunne's presentation and as set forth in Mr. Rubio's Declaration, the Debtors operate throughout Europe, and their business essentially is focused on collecting fees from servicing debts and collecting payments from their own portfolio of investments throughout Europe.

And as you can imagine, Your Honor, such a sprawling enterprise, we saw a great deal of cash flowing through the system and ensuring that that cash continues to flow is of paramount importance to the Debtors.

System-wise, so the 150 subsidiaries that Mr. Dunne mentioned, that cash management system has over 600 bank accounts. But fortunately because there are only two Debtors here, it's quite a bit (indiscernible).

Intrum AB operates three separate cash pools with three lenders, all of whom are lenders under our RCF, and they are BMP and Deutsche Bank.

So the three separate cash pools are generally oriented around geography, (indiscernible), cash pool enterprise, and we focused on the Nordic region, Deutsche Bank, Germany and Switzerland, and BMP has focused on the rest of Europe.

In the BMP and Deutsche, these are more traditional dba cash pools. Cash comes in, whether to a Debtor operating account or a non-Debtor, and at the end of the day this automatically is swept to top accounts. Intrum AB holds the top accounts, they are -- there's several top accounts, depending on which currency we're dealing with. The Debtors have a number of accounts, you know, based on various currencies which (indiscernible), the Nordia cash pool is slightly different, what we call a netting cash pool, which means that various balances throughout all of the accounts are netted against each other just that an individual account may have a negative balance, but so long as the net amount at the top account is positive, that subsidiary account can continue to (indiscernible) the cash pool notwithstanding that some accounts they have a negative balance.

All three of these cash pools are associated with an overdraft facility that Intrum AB may access in the event that there are insufficient funds available within the cash pool. So each of Nordea, CNB -- excuse me, BMP and Deutsche Bank have provided an overdraft facility. In total these

facilities provide $70 million of additional liquidity to the Debtors and that can be drawn on as needed basis.

Through the cash management order we're not seeking relief with respect to the overdraft facilities, but that we'll take up momentarily with respect to cash collateral.

Finally, Your Honor, the cash management motion seeks authority to continue intercompany transactions in the ordinary course of business.  Intrum AB engages in a series of intercompany transactions on a daily basis, both as fine movement within the cash pool, which is both Intrum accounts, Intrum AB accounts and non-Debtors subsidiary accounts, as well as non-pool cash accounts which are all held by non-Debtors.

Generally the flow of funds is into the cash pool and is a source of liquidity as non-Debtor subsidiaries make collections and upstream those fines into the cash pools for access by Intrum AB.  And from time-to-time Intrum AB makes investments down into subsidiary groups in intercompany transactions, such as funds to purchase of a new portfolio of investments.  These are the company transactions that are, of course, tracked.  Such tracking will be continued on a post-petition basis.

We've also shared a form of order with Mr. Ruff and have agreed to a 60-day extension for the Debtors to come and explain the 345(b), subject to the possibility of future

extensions. We think accounts, other than the Texas accounts that we've heard much about, they're all -- they are not (indiscernible), so we've negotiated that period of time with Mr. Ruff to explore a 345(b) solution and a confirmation of it.

Unless Your Honor has any questions, I would respectfully request that the Court enter the cash management order filed at Docket Number 12.

THE COURT: Okay. Let me ask if anyone wishes to be heard with respect to the cash -- the cash management -- okay.

(No audible response.)

THE COURT: Okay. I'll then note for the Record, the Court now considers entry of an interim order authorizing the Debtors to continue the cash management system. I'm going to -- based upon the evidence before me I'm going to grant the relief requested on an interim basis.

Mr. Fedell, it sounds like we need to pick a final date if we're doing anything --

MR. FEDELL: Oh, yeah.

THE COURT: What did you all have in mind?

MR. FEDELL: Yes, Your Honor.

THE COURT: What did you all have in mind?

MR. FEDELL: Approximately 21 days, which would be the week of December 9th for the Second Day Hearing, subject to Your Honor's availability.

THE COURT: Just give me a second, just looking at my calendar here.

(Pause in the proceedings.)

THE COURT: I've been given the green light on December 10th at 1:30 p.m.

MR. FEDELL: Perfect, Your Honor.

THE COURT: Which means -- are you okay with an objection deadline of December 3rd, just to make it a little easier?

MR. FEDELL: Yes, Your Honor.

THE COURT: Okay. Just give me a second. Remind what I said, December 10th at 1:30.

(Pause in the proceedings.)

THE COURT: Okay. It's off to docketing.

Where do we go next?

MR. FEDELL: Thank you, Your Honor.

The next item on the Agenda is a motion seeking entry of -- my camera's down again, but it's -- hopefully it's fixed in a moment -- but interim and final orders with respect to the consensual use of cash collateral. The motion was filed at Docket Number 15, and revised form of order attaching the budget was filed at Docket Number 38.

As we set forth in our motion and Mr. Rubio's Declaration, the Debtors have sufficient cash on hand to fund these Chapter 11 cases, subject to the continuation of the

overdraft facility.  So we're not seeking DIP financing in the traditional sense, but the Debtors do have an immediate need of cash collateral.

Your Honor has heard a lot of the background on the capital structure and the key players here already, but in the advance of filing -- recognizing the need for the continued use of the cash collateral on the cases, the Debtors engaged in good faith arm's-length negotiations with our RCF lenders on what a protection package would look like.

Now I'll note briefly while the Debtors -- the majority of the Debtors' cash is not actually pledged under the RCF.  It is held in the cash management bank for our RCF lenders.  And the Debtors believe that there's a valid right of payoff with respect to have cash, so respectively is cash collateral.

And finance these negotiations with our RCF lenders. By now it was apparent that the main thing of what the RCF lenders were looking for and any adequate protection package was to respect the continued operation of the RCF and to respect the lock-up deal what was struck by the company with the RCF lenders in August.

So as part of that deal, under the adequate protection package, the RCF lenders will be receiving first pay interest at the non-default rate.  We've heard from (indiscernible) that, you know, there was a discussion about

whether it would be default, or non-default, but this deal is for non-defaulted trust, which is significant liquidity savings for the company.

The interim order also authorizes the Debtors to refinance the existing -- excuse me, the outstanding RCF loans that come due during the pendency of this case actually say that essentially rolling over maturities.  And as part of that rollover process, because loans may be drawn in one currency other than the base currency, which are Euros, just based on the FX rate in time, it may be that the outstanding loans exceed available commitment, so there is a small component, a pay down component as part of that rollover process which we are seeking to authorize as well.

And we have -- as part of this order as I mentioned we have also reached an agreement to allow continued access of the overdraft facilities in exchange for a fairly lean over proceeds, superpriority, possibility its overdraft facilities would be significantly constrained on the company's cash management system's ability to -- excuse me, ability to timely process payments to potentially the whole debt case.  So it's certainly in the Debtors' business judgment to continue accessing those overdraft facilities.

And finally, the lenders are receiving [indiscernible 5:50:01] the standard that is actually blamed, meaning a stipulation from the Debtors subject to a customary

challenge period.

And the only other point I would mention in terms of the order is in addition -- as an additional form of adequate protection the secured lenders have agreed that the cash collateral may be used to fund actual use of the unsecured noteholders, the (indiscernible) group. Officially it may appear somewhat unusual to pay an unsecured creditor, which would be a group, the cash collateral order, the Debtors admitted is justified in the circumstances, based on a number of reasons.

First, we have a confirmation hearing scheduled on December 16th now. Depending on how long that hearing goes, those fees that are payable to -- so it's likely that, you know, we may not even receive an invoice (indiscernible) cash collateral order.

However, if there is a delay, and Mr. Finestone had indicated will be targeted in discovery, but if the case is delayed, this is a case where all unsecured creditors are being paid in full, and the Debtors' professionals of course are compensated through the Order of the Court, and that would effectively be the largest supporting group of unsecured creditors who have backstopped the new money objection under the plan as effectively the only party who will need to wait to be paid during this case.

And then lastly, we submit that no party will be

prejudiced.  This really -- as I mentioned, all of the unsecured creditors are paid in full.  And if Mr. Finestone has his way in the case, and the case is (indiscernible) table upon dismissal of the Chapter 11 case.

So unless Your Honor has any questions, or any party wishes to be heard on the cash collateral order, the Debtors would request that the Court enter the order filed at Docket Number 38.

THE COURT:  Anyone wish to be heard?

MR. FINESTONE:  Yes, yes, Your Honor.  Ben Finestone from -- for the Ad Hoc Committee of 2025 Noteholders.  There's just two targeted objections, Your Honor, one of which Mr. Fedell referenced and one that he did not.

The first one, and I appreciate him referencing this, I just want to underscore it, the Debtors are seeking authority -- and, Mr. Ruff, I think you'll be interested in this as well -- the Debtors are seeking authority to pay the fees of an unsecured ad hoc noteholder group.  The ad hoc noteholder group has purported adequate protection for the secured lenders' collateral.

I almost could stop my argument right there, it makes no sense, there's been no evidence from the secured lenders that have come into court and said, we -- somehow our constitutional property interests needs protection from the imposition of the automatic stay, and the way we think that

that protection will be afforded to us, the owners of the property interest, is by paying the unsecured noteholder group's fees.

It's that there is a logic to that, if there is any precedent for it, and I credit Milbank for the clever formulation.  If there any precedent or logic to it, I, on behalf of my clients, will pledge that we, too, are willing to contribute to the adequate protection of the secured lenders if the Debtors would like to pay our fees.  So, because we also are unsecured creditors.

I don't know why paying our fees would offer adequate protection to the secured lenders.  It doesn't make sense.  I've never seen it before.  They shouldn't -- the unsecured creditors should not get adequate protection for a secured lenders' property interest.  So that should be stricken I think quite plainly.

And then the other objection, Your Honor, is there's a strange -- there's strange language in Paragraph 21 of the order.  It's that the interim order governs over anything else that Judge -- that Judge Lopez may enter in this case.  And I think it's the opposite, interim orders are interim orders and language like that is a recipe for confusion later.

If there's going to be a final order, that's going to govern.  If there's going to be other orders, those are going to be subsequent, they're going to govern.

THE COURT:  Can you --

MR. FINESTONE:  This is an interim order based on --

THE COURT:  Mr. Finestone, can you --

MR. FINESTONE:   -- (indiscernible) --

THE COURT:   -- point me just --

MR. FINESTONE:  Sorry, Your Honor.

THE COURT:  No, no, no, it's fine.  I just want to make sure that I'm -- oh, I got it.  Got it.

MR. FINESTONE:  Well, 41, unless it changes with the black line today, but it says, "Interim order governs."

THE COURT:  Got it.  Got it.

MR. FINESTONE:  And, you know, and if you want the adequate -- the payment of the unsecured creditors to be the -- to control that would be notes, Ad Hoc Group, professionals.

So those are my only two objections to the interim cash collateral order, Your Honor.

THE COURT:  Mr. Fedell.

MR. FINESTONE:  But my offer stands, my offer stands to the Debtors if they want to pay my Committee's fees in addition to the Latham & Watkins Committee's fees, then even more adequate protection, and we can all feel like we're respecting the Constitution here.

MR. FEDELL:  And, Your Honor, may I respond to the fee --

92

THE COURT:  Oh, yeah.

MR. FEDELL:   -- claims --

THE COURT:  Yeah, of course.

MR. FEDELL:   -- in particular?

THE COURT:  Of course.

MR. FEDELL:  I know Mr. Finestone is being glib, but just to be clear, the Latham constituency are our plan supporters and they're already (indiscernible).  And as I mentioned, the theme of the new negotiations with the secured lenders with respect to what the adequate protection package looks like.

It is respecting the deal that was struck with lenders pre-petition.  And as part of that deal the fees of these 14 creditors are paid and have been paid and those fees there's potential default under a Lock-up Agreement.  I don't know what the result of that default would be, but I don't want it (indiscernible), you know.

I think there's a vested interest to the secured lenders and the Debtors in paying these fees.  It's also not unusual or unheard of to pay the fees of secured creditor's constituencies in a Chapter 11 case.  Maybe somewhat unusual in the context of a cash collateral order, but we see these fees paid all the time now under a 363 motion to assume the facts that were agreed, by the way, we have here.

So if we don't get these fees done this way, I'd say

I'm going to reserve a right to seek payment of the fees in another way.

And lastly, I just want to express some confusion with Mr. Finestone's posturing as the defender of the bankruptcy process when he is also asserting that these are the most solvent Debtors in the history of Chapter 11. So under that line (indiscernible) I believe that certainly it is appropriate to pay these professional fees.

Thank you, Your Honor.

THE COURT: Mr. Finestone, any response?

Or anyone else wish to be heard? Maybe I'll just open it up, actually, before I go back to you, anyone else wish to be heard?

(No audible response.)

MR. GOLDBERG: Thank you, Your Honor. Adam Goldberg of Latham & Watkins. Can you hear me?

THE COURT: Yes, just fine. Thank you.

MR. GOLDBERG: Thank you, Your Honor.

We appreciate the Debtors' argument. I think as Mr. Fedell explained the issue, and just to be precise for Your Honor, in the Record we have the Lock-up Agreement is attached to the Disclosure Statement at Docket Number 17-2.

The Lock-up Agreement includes a covenant by the company to pay the fees of the noteholder group at Section 3.4(j), and provides a termination event in the event

the company fails to comply with the covenant at Section 8.3(c)(1).

And so we would agree with Mr. Fedell that this is a matter of adequate protection for the lenders, it supports the efforts to confirm this plan and perform under the backstop agreement which is inter-conditional with the Lock-up Agreement, and also as a valid exercise of the Debtor's --

THE COURT:  No, I get the lock-up portion of it. Tell me why it's adequate protection.

MR. GOLDBERG:  Well, Your Honor, because the lenders here are benefitting from the existence of the Lock-up Agreement and the Backstop Agreement which commits to invest new funds with the Debtors on the consummation of the Plan. And so by preventing the occurrence of a termination event under the Lock-up Agreement, the Debtors are protecting their ability to service their obligations to the RDF lenders and preserve the collateral.

THE COURT:  Now I got it, there's a Lock-up Agreement, and it's all tied to the lock up and there would be a default.  But tell me why it's adequate protection.  To the extent that -- it's the extent of diminution in the value of the collateral.  Why are -- tell me why it's adequate protection.

MR. GOLDBERG:  Well, Your Honor, I think there's really two factors here that would support the payment of

these fees.  One is that the payment of these fees prevent the diminution of the lenders' interest in their collateral by -- I don't want to be rehashing the lock up point too much, Your Honor, but --

THE COURT:  Right.  But it's tied --

MR. GOLDBERG:   -- but I think the --

THE COURT:   -- to the lock up.  Right?  It's tied to the lock up, not to the actual use of the cash.  Right?

MR. GOLDBERG:  Correct, it is tied to the Lock-up Agreement because the lock up supports the value of the Debtors' collateral by -- the lenders' collateral by providing the Debtors with a route to exit Chapter 11 and obtain the benefits of the backstop agreement, together with the haircut in the bonds that allowed the Debtors to service their obligations going forward.

THE COURT:  Are you aware --

MR. GOLDBERG:  In addition to that, the lenders --

THE COURT:  Mr. Goldberg, are you aware of any case where that's ever been approved?

MR. GOLDBERG:  Before this Court, I'm not, Your Honor.  We don't have a precedent.  I would also add, Your Honor, here that the lenders are essentially agreeing to these payments.  This is an agreement among the lenders, the noteholder group and the Debtors that effectively operates the carve out from the lenders' collateral.

THE COURT: Okay. Mr. Finestone, on the agreement on the language, I think this is just an interim order and if I enter another order, I'm comfortable there. Let's keep going. I need to -- I want to come back to the cash collateral order, I want to give this some additional thought in my mind while we continue to -- while we continue to talk.

MR. FINESTONE: Okay. Should I briefly respond, Your Honor, or are you saying move on to another topic?

THE COURT: No, let's just move on to another one. I'll give everyone some time, I just want to mull this over a little bit and read the language a little bit more carefully. I may take a five-minute break and just kind of read the language and see how it all works. I'm not saying I'm for it or against it, I just want to give it a little bit more thought.

MR. FINESTONE: Okay. Could I just offer one clarification, before Your Honor goes back to the documents, of my argument?

THE COURT: Sure.

MR. FINESTONE: Yeah, I'm not arguing that at a future date and time the Debtors cannot get authority from Your Honor to make the payments under the Lock-up Agreement, if this Court approves that Lock-up Agreement or this Court approves a plan that provides for it.

But for now if I can quote Judge Isgur when he was

talking about an RSA, he said, "That's you-all's RSA, that's not that the Court doesn't approve the RSA."

So this -- to say that the payments -- that the Debtor agreed to make those payments under a not court-approved agreement, I think is not before the Court today, it's not a basis for adequate protection not contemplated by Section 361.

Thank you, Your Honor.  That's all I had on cash collateral.

THE COURT:  Yeah, I got it.  Let's just keep going. I think for most of these, we should be able to go pretty quickly.  I just want to keep giving it some thought.

So let's go to hedging I think is 11.

MR. FEDELL:  Yes, Your Honor.  The hedging motion is filed at Docket Number 11.  And under this motion, we are seeking to continue the pre-petition hedging and enter into a post-petition hedging arrangement.  Given the nature of the Debtors' business, they are particularly sensitive to fluctuations that involve currency exchange rate and interest rate deduction is not surprising.  The Debtors have historically engaged in a number of derivative transactions to mitigate these risks.

A significant majority of these hedging arrangements are with certain RCF lenders.  Although hedging obligations are not -- actually allegations under the RCF, under an inter-

creditor agreement, they are secured by security -- the same collateral, excuse me, carried with the RCF issue.

And pursuant to the Lock-up Agreement, the hedges are subject to a limited debt basket under the RCF and tend to (indiscernible).  So the maximum hedging exposure relatively smooth in here.  And as such, as of the petition date the Debtors' mark-to-mark exposure of the (indiscernible).

As part of the cash collateral negotiations, the RCF lenders have agreed to help out the Debtors to continue their pre-petition hedging in exchange for being a super priority claim which are carried with the adequate protection they granted in part, hopefully soon to be granted in the cash collateral order.  The order also gives comfort of hedge counterparties that they can continue to sell or trade, (indiscernible) in the ordinary course of business the opportunity for Chapter 11.

There have been no objections to the entry of this Order, and the Debtors submit that entry of the Order filed at Docket Number 11 is sound exercise of their business judgment and that the Court enter the Order.

THE COURT:  Any objection to entry of the what I'll call the "Hedging Motion," and for purposes of an interim order?

(No audible response.)

THE COURT:  Okay.  I've considered this motion and

reviewed it.  I believe this is in the best interest of the estate based on the evidence.  I'm going to approve the entry of an interim order here.

And I -- Mr. Fedell, I will enter the December 10 at 1:30 December 3 objection deadline for this order as well, and I'll get it on the Docket.

And this really -- is the order at 11 still the one you want me to sign?

MR. FEDELL:  Excuse me, Your Honor, I didn't catch that.

THE COURT:  Is the order at -- is it -- the one that's still attached to the motion at Docket 11 is still the -- that's the one you want me to sign?

MR. FEDELL:  That's correct, Your Honor.

THE COURT:  Okay.  Thank you.

I'll get this signed and on the Docket.

MR. FEDELL:  Thank you, Your Honor.

And subject to whenever Your Honor wants to recall the cash collateral motion, I will cede the podium to my colleague to (indiscernible).

THE COURT:  Okay.  Let's just keep going.  Let's just -- we should be able to tick through some of these pretty quickly.

Good afternoon -- good evening.  Oh, boy, sorry about that.  Good evening.

MS. SHIVASU:  That's funny because I actually have afternoon crossed out in my notes.

(Laughter.)

MS. SHIVASU:  Good evening, Your Honor.  My name is Ruth Shivasu (phonetic) of Milbank, the counsel for the Debtors.  I will be presenting the Debtors' wages motion which is filed at Docket Number 10 and is Item Number 7 on the Agenda.

I'll just very briefly discuss some background on the Debtors' workforce.  As of the petition date the company as a whole employed approximately 10,000 employees, but the Debtors only employ approximately 81 individuals, primarily (indiscernible).  The employees perform a number of essential functions including IT, finance, legal, HR and operation services, all of which are critical to preserving the company's operational facility and efficiency.

Without the ability to provide compensation to the employees and to continue to offer health and welfare benefits programs, the Debtors are very likely to face interruptions to their operations throughout these Chapter 11 cases.  As such, and pursuant to the wages motion, the Debtors are seeking entry of an order authorizing them to maintain and continue to honor these obligations in the ordinary course of business and pay related amounts incurred or accrued pre-petition.

While I won't go into the details of each specific

compensation and benefit program that we describe in the motion, I'm happy to answer any questions Your Honor has. Just kind of very high level, the Debtors do not believe that any of the relief requested in the wages motion is out of the ordinary. For example, the Debtors are not requesting authority to pay any pre-petition amounts on account of (indiscernible) or retention programs to any of their employees, nor are they requesting authority to pay any severance to an insider.

Additionally, none of the payments the Debtors will make to any individual employee, contractor or a director will exceed the statutory cap set forth in Section 507(a)(4) of the Bankruptcy Code.

And finally, this motion and the proposed order were shared with the US Trustee who just provided some minor comments to the order, which we have incorporated in the version that was filed on the Docket, ECF Number 10.

Accordingly, Your Honor, unless you have any questions, the Debtors respectfully ask the Court to grant the relief requested in the wages motion.

THE COURT: Any objection to the approval of the wages motion?

(No audible response.)

THE COURT: Okay. I'm going to grant this motion. I think this is -- for bankruptcy judges this is like the most

important motion in making sure that folks who are going to show up to work know they're going to get paid and that there's going to be -- a bankruptcy filing isn't going to impact that.  And Congress have given them a statutory prior and this is just, you know, recognizing this.

So I'll get this signed and on the Docket.  Thank you very much.

MS. XXX:  Thank you, Your Honor.  I'll pass it on to my colleague, Sara Posner, for the next two motions on the Docket.

THE COURT:  All right.

MS. POSNER:  Good evening, Your Honor.  Sara Posner of Milbank on behalf of the Debtors.

I will be handling I think the next three motions on the Agenda beginning with Agenda Item Number 8, the Debtors' motion to pay pre-petition trade claims, which is filed at Docket Number 9.  I'll also note, Your Honor, we filed a revised form of interim order at Docket Number 24-2.

Your Honor, by this the Debtors seek authority to pay certain pre-petition critical trade claims or vendor claims and 559 claims in the ordinary course.  In the interim the Debtors request the authority to pay up to 114,000 on an interim basis, which I know for the Court is less than 1 percent of the original funded debt.

Additionally, as the Debtors have commenced these

cases (indiscernible) pre-packaged plan in that case all general unsecured creditors in full. By this motion the Debtors are merely seeking to alter the timing of the payment to holders of these trade claims.

Without the ability to pay these trade creditors to provide essential services to the Debtors, the Debtors were losing vital services, products, and relationships, which we have a referral practice in nearly every aspect of the business. In particular, given the potential unfamiliarity of a foreign creditor with the Chapter 11 process, we believe there is a risk that (indiscernible) -- a single invoice could cause a foreign creditor to sever its relationship with the Debtors or delay. This provision of our products or service (indiscernible) businesses.

I'll note for the Court that we did share the motion and the order with the United States Trustee. We did not -- we did file the revised order at Docket Number 22-2 to address comments given to us.

Unless Your Honor has any further questions, we'd respectfully request that Your Honor enter the proposed order at Docket Number 24-2.

THE COURT: Any objection to the critical vendor motion, the interim -- relief requested in the interim in the critical vendor motion.

(No audible response.)

104

THE COURT:  Okay.  I appreciate the Office -- the comments from the Office of the United States Trustee.  I know exactly what you did, I can see it here.  This makes sense to me, and I see the interim claims cap.  I'm going to approve the relief requested, I'm going to grant emergency consideration of the motion, I find it's in the best interest of the estate, and I will grant the relief requested.  Okay.

MS. POSNER:  Thank you, Your Honor.

The next item is Agenda Item Number 9, which is the Debtors' request for entry of an order enforcing the automatic stay protections under the Bankruptcy Code, which is filed at Docket Number 6.

Your Honor, given the global nature of these cases, and the numerous non-US parties of interest in these cases, we believe that not all parties in interest will be familiar with the global reach and the self-perpetuating provision of the Bankruptcy Code.

Therefore, we are seeking an order to ensure that all parties in interest in these cases are aware of these provisions.  The Debtors believe that the motion as drafted is appropriately lay out these key provisions.

So if there are any questions, I can hopefully answer them, but if not, we respectfully request that the order filed at Number 6 be entered.

THE COURT:  Any objection to this motion?

MR. FINESTONE: Your Honor, Ben Finestone on behalf of the Ad Hoc Committee of 2025s.

We object to the motion, Your Honor. It seeks an advisory opinions from Your Honor. Your Honor has no reason to interpret the automatic stay. I don't disagree with Your Honor, just to be clear -- I'm sorry -- I don't disagree with the Debtors that the case law fairly overwhelmingly holds that the automatic stay applies extra-territorially and internationally.

But I think it's inappropriate to ask a Bankruptcy Court to enter an order effectively interpreting the automatic stay. The interim wants to issue a press release saying that they filed for bankruptcy and they believe the automatic stay prevents enforcement actions, they can do it, but I don't think it's -- I just don't think the Court has jurisdiction to enter the order.

And I also don't think there's been any showing of irreparable harm by the Debtor with respect to enforcement actions that could justify having this order be entered on an emergency basis today, Your Honor.

THE COURT: Counsel --

MR. FINESTONE: Your Honor, I think --

THE COURT: Go ahead.

MR. FINESTONE: Oh, sorry, Your Honor.

THE COURT: Go ahead.

MR. FINESTONE:  I was just going to say -- excuse me for talking over you, Your Honor, I was going to say Congress has spoken with Section 362 of Title 11, and that's all that any of us American citizens need.

THE COURT:  All right.  Counsel?

MS. POSNER:  Your Honor, may I?

THE COURT:  Yes.

MS. POSNER:  I mean, Mr. Finestone has acknowledged that the automatic stay exists, he filed a motion to lift the stay.  We're merely asking for an administrative order to let foreign creditors know that the automatic stay exists and that it has far reaching effects.  There should be no dispute on that.

THE COURT:  Just one moment.  Just one moment.

(Pause in the proceedings.)

THE COURT:  So I'm going to agree with both of you a little bit.  I'm just going to make one slight tweak to this Order.  I do think that the purpose of this Order is just to restate quite frankly what the automatic stay is and provide notice for parties who are in foreign countries to know that this -- the automatic stay exists.

And I've taken a look at the language here closely, and I'm comfortable that we're just restating what the automatic stay says.  And there's language in there saying that nothing is there to expand any powers that are afforded

to the Debtor under Bankruptcy Code.

The only short tweak that I would make to your Order is --

(Pause in the proceedings.)

THE COURT:  -- if you pull up your Order and you go to Page 8 of 11, this is a hypertechnical Lopez comment just for purposes of this Order, and you can try to convince me otherwise, but you go to Page 8 of 11 --

MS. POSNER:  You said Paragraph 8, Your Honor?

THE COURT:  No, no, no, I mean, Page 8 --

MS. POSNER:  Oh, Page 8.

THE COURT:   -- Page 8 of your Order here.

MS. POSNER:  Yes.

(Pause in the proceedings.)

MS. POSNER:  Your Honor?

THE COURT:  I think the including -- after foreign country including any division, department, agency, instrumentality, or service thereof, I would just -- and all those -- I would just strike that clause.  It's just more of a me thing, because I don't want to get into hypertechnical points about divisions and instrumentalities, and I don't know what a foreign country's instrumentality is.

But for purposes of what you have, I think you're good.  I can sign this order at Docket 6, and if you strike that clause -- and I'll sign the Order, but when you send out

the notice I'd feel comfortable.

MS. POSNER:  Absolutely, Your Honor.  We'll remove that clause.

THE COURT:  All righty.  I am comfortable we're just restating what the automatic stay is here, and I don't think I'm being asked to give advisory opinions.  It's just I do -- but I do see -- that's why I really do stare at the language, to make sure that nothing is in there.

And with that, what do you have next?

MS. POSNER:  The next item on the Agenda is Item Number 10, which is the Debtors' motion to file (glitch in the audio) filed at Docket Number 5.

THE COURT:  Yep.

MS. POSNER:  There are few responses early in this motion including the authority to file a consolidated creditor matrix, consolidate a list of the largest unsecured creditor for all Debtors, and to request a modification of your requirement that (indiscernible) security holders and provides it directly to them.

These have been previewed with the Office of the United States Trustee who raised no objection to these requests.  (indiscernible) our meeting I'm resolved to share with the United States Trustee, which is the Debtors' request for authority to adapt certain personally identifiable information.

The information would include the entire physical likes of employees, independent contractors and just -- and other individuals.

We would just request this morning, Judge, because filing of public -- misinformation publically does offend us individuals to have issues and (indiscernible) and furthermore, there are privacy in the infrastructure laws in the jurisdictions where the Debtors and non-Debtors affiliates (indiscernible) and do business and disclosure of this type of information does (indiscernible) status protection regulations and European general status regulations and any breach of this would open the Debtors and Debtors affiliates to liabilities.

(Indiscernible) would request (indiscernible).

THE COURT: Anyone wish to --

MS. POSNER: If Your Honor has any other questions? Sorry, go ahead.

THE COURT: No, no, no. You go ahead. I'm sorry.

MS. POSNER: I was just going to ask if Your Honor has any questions.

THE COURT: No questions from me.

Let me just ask, Mr. Finestone, on this one I know that you had some issues on the consolidated piece, but the fact that you're going to get now Schedules, I think gives me -- I'm actually comfortable with a consolidated creditor matrix. You're going to get a Schedule of the one that you're

110

really want.  I think this is just kind of routine, but I'll let you talk me out of it.

MR. FINESTONE:  Good memory, Your Honor.  I don't think I have much to add.  I'm just pausing to allow my brain to think about whether or not the Schedules have -- will have the same list of creditors that the top 20 does, and I think it does.  So Your Honor is right.  My objection has been resolved, as long as Mr. Leblanc's (indiscernible) includes a list of all creditors of Texas, the Intrum AB of Texas, of which I think there are none.

THE COURT:  And if anything changes, come back and just let me know if anything -- after you see the Schedules.

I'll grant this relief requested.  I'm comfortable with where we are.

Thank you.

MS. POSNER:  Thank you, Your Honor.

With that, I'd like to yield the virtual podium to Ms. Blazek.

MS. BLAZEK:  Good evening, Your Honor.  Hannah Blazek of Milbank, proposed counsel for the Debtors.  I'll be handling the last unaddressed item on the Agenda, which is Item Number 11, the Debtors' taxes motion, which was filed at Docket Number 8.

By this motion, the Debtors request entry of a Final Order authorizing the Debtors request entry of a Final Order

authorizing the Debtors to pay taxes and fees that arise or through whether pre-petition or post-petition in the ordinary course of the Debtors' business.

Now as described in the motion during the pendency of these cases, the Debtors anticipate special payroll taxes coming due and the estimated amount accrued as of the petition date for these taxes is approximatley $30,000.

To the extent that these or other taxes become due during the cases, the Debtors seek authority to fulfill these obligations to ensure that the non-payment of any taxes does not disrupt the Debtors' operations.

To the extent this motion and Order with key stakeholders, including the US Trustee, who had no comments, no objections to this motion have been filed.

So unless Your Honor has any questions, we would respectfully request that Your Honor enter the Order.

THE COURT:  The objection to the taxes motion, okay. I'll find that there's been emergency consideration is appropriate.  I will grant the relief requested.  It's important to pay the taxes and that just creates a host of issues if you don't, and gives rise to a host of liabilities. And so it's just important to just get it done and get it done now.

Counsel, I will sign that Order and get it on the Docket.

Thank you.

Folks, just give me about five minutes.  I'm just going to -- I have printed the Order.  I'll come back on. It's, I don't know, 6:23 my time.  Why don't I just -- well, just give me seven minutes.  It's going to take me a minute to walk to chambers.

So I'll come back on at 6:30.  I just want to take a look at one thing and we'll come right back on.

Thank you.

MS. BLAZEK:  Thank you, Your Honor.

(Recess taken from 6:23 p.m. to 6:31 p.m.)

THE COURT:  Okay.  Back on the Record in Intrum AB. Just give me a second here.  I'll let everyone get back on.

Here are my thoughts, and I want Mr. Fedell and Mr. Gilbert, this doesn't feel like adequate protection to me. It feels like an option payment to kind of keep more like a use of cash collateral than -- which could be a valid purpose for use of cash collateral.  But it doesn't feel like adequate protection to a secured creditor to me, so I'm not -- I'm not comfortable calling it adequate protection to the extent that diminution of collateral, which is how it's defined throughout the document.

But, which I'll want to do.  I mean, we can try to push it to a final if you want it, that gets your comfortable. If you want to try to call it kind of a use of cash collateral

and I know Mr. Finestone may disagree with that, but I may not think of it differently, but I don't want to call it adequate protection because I think it's really not adequate protection and someone -- at least I'm not comfortable calling it that on an interim, but it's probably a use of cash collateral, but I don't know what thoughts you-all have.

I'm just -- if you want to go to a final, I'm more than happy to do so and those fees can accrue and if they get approved on a final, they can all get paid.  If you want to think about it differently, I'm open to that, too, but I just am not comfortable calling them adequate protection at this time and maybe I just need to give it a little bit more thought, but I'm just not there for purposes of today.

Mr. Fedell, what thoughts do you have?

MR. FEDELL:  Your Honor, from the Debtors' perspecting taking the issue to final, whether, you know, it's docketed as a 363 form of relief or a use of cash collateral in the Final Order, I think (glitch in the audio) and correct me, but the invoices likely will not be due and payable until the Final Order.  So I think that can give us adequate time to come up with a solution to this issue.

THE COURT:  Mr. Goldberg, let me hear your thoughts.

MR. GOLDBERG:  For the Record, Your Honor, Adam Goldberg of Latham Watkins on behalf of the Ad Hoc Group.

We appreciate Your Honor's consideration of the

issue and then it's been a long hearing and there are many issues at stake in this case.

We would welcome the opportunity to take this issue up at the Second Day Hearing and consider it as part of the Final Order.

THE COURT:  Okay.  No, I appreciate that.  I think that makes a lot of sense and I can probably get a lot more comfortable, but there, and I'm not saying it's not, but just for purposes of today, I think making it subject to the final, I think, kind of preserves everyone's rights and I think what we'll all be a lot -- I think I and everyone else will all be a lot smarter when we get to kind of December and we'll see kind of where this case is shaping up and where we're going.

But so let's just kind of take this up on a final and really the Court's ruling is not comfortable for purposes of today, but everyone's rights are preserved in connection with the final and there's a way that I can get comfortable.  But it's just not -- I think, it's just going to require some additional thought, subject to, obviously, objections of Mr. Finestone's group or any other party that may come.

But let's just -- Mr. Fedell, I don't want to -- I don't want to take the pen on this one.  Maybe you-all can just kind of add in the dates and tweak something and get -- upload something for me and I'll sign it.  Just let me case manager know.

MR. FEDELL:  Understood, Your Honor.  We will do so.

THE COURT:  Okay.  So I think that covers everything, but I think -- well, I know I still have to talk about a date with Mr. Finestone, but I think for purposes of Orders that I've signed, I've signed every one, but I think two of them, you're going to take cash collateral and is it the Disclosure Statement?

MR. FEDELL:  It's the Scheduling Order, yes, Your Honor.

THE COURT:  The Scheduling Order, okay.  And you-all will just let my cash manager know when it's up and you'll circulate them and we'll get them -- and I'll get them signed and on the Docket.

MR. FEDELL:  Very well, Your Honor.

THE COURT:  Okay.  Mr. Finestone?

MR. FINESTONE:  Thank you, Your Honor.  Can I first just ask that I be one of the parties that the revised cash collateral order be distributed to on this issue of not approving the fees and expenses on an interim bases, Your Honor.

I haven't been -- when the Debtors have been listing the parties who they're going to circulate orders to, they probably --

THE COURT:  I think that makes sense.  You were the objecting party, so I think it makes sense to just kind of

tweak it, but again, I don't want this over-lawyered.  It's just -- this is subject to the final and, you know, one sentence will get it done for me.

MR. FINESTONE:  Yeah, well, can I ask for clarification?  It's not that the Court is approving it, but allowing it to be -- allowing an objection to be raised again, instead the Court is saying we're not approving it today, but you Movants can present it to me again at the Final Order.

That's different than just --

THE COURT:  That's --

MR. FINESTONE:  -- (glitch in the audio).

THE COURT:  That's exactly right.  That's exactly right.

MR. FINESTONE:  Thank you, Your Honor.

The other thing that I wanted to raise, but I think I thought Your Honor being a step ahead of me, we did file an emergency motion for relief from the automatic stay.  It's at ECF Number 28.  I am not the Debtor, so I didn't put it on an Agenda, Your Honor.

I will just say this:  I saw Your Honor's reaction, stay relief from the First Day of the case sounds extreme.  This is an action that my clients commenced in Sweden prior to the filing of the voluntary petition and it seeks to -- the Debtors on November 15th held a meeting in Sweden seeking to solicit votes from their Swedish noteholders to make an

117

amendment to the Swedish indentures.

And one of the amendments that they claim to have made was to cause the Texas entity, Intrum Texas, to become a guarantor on the Swedish debt.  And we believe that is to use US parlance, Your Honor, that was a -- the amendments that they proposed was a sacred right and required 90 percent Swedish bondholders to vote in favorite of it and the Debtors think it only required 50 percent.  On one of the indentures, they didn't even get 50 percent.

In any event, Your Honor, we filed an action asking a Swedish court to decide just the legal issue of whether or not Mr. Leblanc is right that it gets it done with 50 percent, or I'm right that they needed 90 percent.  The action does not speak in any respect to enforce remedies against the Debtor, to attach assets, dismember the Debtor, any of that, it just seeks a legal ruling.

The reason it's relevant, Your Honor, is because when I argue the motion to dismiss before Your Honor, one of the things I'm going to say is that this entry, Intrum of Texas, never became a guarantor.

Now, Your Honor is capable of making that ruling.  I know that obviously.  It's an issue of foreign law.  I just think that it makes better judicial allocation to allow the Swedish court to consider it, as well, and have that ruling be brought back to Your Honor to consider in context of the

motion for -- the motion to dismiss these Chapter 11 cases.

So that was a long way of saying, yes, it's a stay relief motion. Yes, it's presented on an emergency basis, but it's not a stay relief motion to put my hands into Mr. Leblanc's client's pockets in any respect. It's seeking a legal ruling from a judge who issues Swedish rulings all the time, which I don't know for sure Your Honor hasn't done, but quite possible that Your Honor hasn't issued Swedish rulings.

So that's the gist of the stay relief motion, Your Honor.

THE COURT: So here's what I'll do.

Mr. Leblanc, I'm going to -- I know emergency relief has been requested here. It was filed, I think, today. I think in all fairness to process, maybe I'll just ask that in the next few days you get a response on file and then I'll consider the emergency relief and everybody can kind of -- I think that's probably the right thing for me to do is just give you a couple of days to kind of read it, respond to it, and not kind of get on the spot about it.

It wasn't on the Agenda today, but it's something that's here. I'm glad we're talking about it. Just get something on file and I will read it and then maybe I'll either set something or give parties a call, then we can talk about timing of it. I think that's probably the right thing for purposes of today.

MR. LEBLANC:  Sure.  Your Honor, Andrew Leblanc of Milbank on behalf of Intrum.

Your Honor, that's fine.  I have that you'll take the notes that I wrote in advance of this hearing to argue this today and convert that into a response, which I think will be -- Your Honor, the process will be better for that for us doing it in a written response.  I will simply say, Your Honor, this is -- as extraordinary as it is, it is misguided.

Mr. Finestone is well aware Intrum of Texas -- Intrum AB of Texas, the record is now uncontroverted.  It's a guarantor of much more debt than just the medium term notes that are at issue in his Swedish proceeding that was filed a couple of hours before our petitions were filed timely.  He well knew when those petitions would be filed.

We'll address all of that in our submission, Your Honor.  I think we can probably get it on -- get it filed with the Court.  We're going to prioritize discovery, Your Honor, but I think we can certainly get something responsive to the pleading by the end of the week and my team is throwing daggers at me right now, but we'll endeavor to do that by Friday and then we can --

THE COURT:  No, just tell them I did it.  But I would just ask --

MR. LEBLANC:  They're sitting here, Your Honor, so they know I did it, unfortunately.

THE COURT:  Well then, let me -- let them -- maybe Friday by, you know, 2:00 Central, just get something on file and it doesn't -- I don't, you know -- just so I can read it and kind of have an opportunity to think about it.

I'll be back from -- I'd like to read it Friday afternoon, but not kind of -- if I -- it's really for their benefit because if I just say Friday, then I'll get hit with the midnight special, so maybe Friday at 2:00 p.m. with the judge's ruling, it'll make sure that they -- it'll force them to get something on file, so.

MR. LEBLANC:  We will do so, Your Honor.

THE COURT:  Okay.  Is there anything else?

MR. FINESTONE:  Your Honor?

THE COURT:  Go ahead.

MR. FINESTONE:  I'll push my luck.  Thank you, Your Honor.

Mr. Leblanc received some daggers, but he also threw some daggers my way after seeing them throw daggers at him.

So let me just say that, like, as far as the Record being uncontroverted, this was an emergency hearing that I had no opportunity to receive any discovery on.  I did ask Mr. Leblanc to send me any documents about guarantees that Texas could have incurred and I didn't receive any.

And finally I'll just say I actually believed the witness, at least for purposes of today, that they did cause

121

Texas to incur all this debt, but they did it for no reason other than to be able to stand up here and say that it had debt.  It didn't actually receive any value or do anything with any proceeds.

So we'll see what Mr. Leblanc is going to share with me, but uncontroverted record I thought was a bit of a sharp dagger, so I just wanted to respond.

THE COURT:  No, it's just I appreciate everyone's comments today.

Thank you very much for appearing.  I think we'll call it a day and we'll all be -- I'll look forward to seeing everyone again soon.

Thank you very much.

Have a good day.

(The parties thank the Court.)

THE COURT:  Thank you.

(Proceedings concluded at 6:44 p.m.)

**\* \* \* \* \***

122

*I certify that the foregoing is a correct transcript to the best of my ability due to the condition of the electronic sound recording of the ZOOM/video/telephonic proceedings in the above-entitled matter.*

*/S./   MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #69354*

*DATE FILED:  NOVEMBER 26, 2024*