UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS (HOUSTON)

|  |  |
|---|---|
| | . |
| IN RE: | . Case No. 24-90575 |
| | . Chapter 11 |
| INTRUM AB, | . |
| | . 515 Rusk Street |
| | . Houston, TX 77002 |
| Debtor. | . |
| | . Tuesday, December 31, 2024 |
| . . . . . . . . . . . . . . . . . | . 11:00 a.m. |

TRANSCRIPT OF ORAL RULING
BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Debtor: | Milbank LLP |
| | By:  ANDREW M. LEBLANC, ESQ. |
| | MELANIE W. YANEZ, ESQ. |
| | HANNAH BLAZEK, ESQ. |
| | JULIE WOLF, ESQ. |
| | 1850 K Street NW |
| | Washington, DC 20006 |
| | (202) 835-7574 |
| | |
| | Milbank LLP |
| | By:  DENNIS F. DUNNE, ESQ. |
| | 55 Hudson Yards |
| | New York, NY 10001 |
| | (212) 530-5770 |

APPEARANCES CONTINUED.

| | |
|---|---|
| Audio Operator: | Courtroom ECRO Personnel |
| | |
| Transcription Company: | Access Transcripts, LLC |
| | 10110 Youngwood Lane |
| | Fishers, IN 46048 |
| | (855) 873-2223 |
| | www.accesstranscripts.com |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

2

APPEARANCES (Continued):

For the Debtor:           Kirkland & Ellis LLP
                          By:  JAIMIE FEDELL, ESQ.
                          333 W. Wolf Point Plaza
                          Chicago, IL 60654
                          (312) 862-2000

For the United States     Office of the United States Trustee
Trustee:                  By:  CHRISTOPHER ROSS TRAVIS, ESQ.
                          515 Rusk Street
                          Suite 3516
                          Houston, TX 77002
                          (202) 603-5225

For RCF SteerCo Group:    Clifford Chance US LLP
                          By:  BRIAN LOHAN, ESQ.
                               MAJA ZERJAL FINK, ESQ.
                               MADELYN NICOLINI, ESQ.
                          Two Manhattan West
                          375 9th Avenue
                          New York, NY 10001
                          (212) 878-8000

3

(Proceedings commence at 11:00 a.m.)

THE COURT:  Case Number 24-90575, which is Intrum AB and Intrum AB of Texas here in connection with an oral ruling on joint motion to dismiss and the plan confirmation.

Before I begin, Mr. Leblanc, I just want to make sure, if you can just raise your hand, if you can hear me, just want to make sure that you can.

Okay.  And I guess before we get started, if you can also give me a hand in the air if things are still where they are and require me to rule.

Okay.  All right.  Here we go.  Before I begin, I want to thank all the attorneys and everyone who participated in the hearings that we had recently in December.  I really thought a lot about the issues that are before the Court in connection with the motion to dismiss and in connection with plan confirmation.  And I kind of took a couple of extra days to really think about the issues and go through the evidence.

It's a big issue for many people, obviously, and I wanted to make sure that I was able to at least articulate my thoughts, hopefully in a way that people will understand.  And so here's the Court's ruling.  I'm just going to start reading.

Intrum AB and Intrum AB of Texas, LLC started these Chapter 11 cases seeking confirmation of a prepackaged plan of reorganization.  The plan is supported by a significant number of secured and unsecured lenders.

4

And there is strong opposition from an ad hoc group of 2025 note holders.  This ad hoc group moved to dismiss the case for lack of good faith under Section 1112(b) of the Bankruptcy Code.  They also object to plan confirmation on several grounds.

The Office of the United States Trustee objected to plan confirmation based on the outbound for consensual third-party releases under the plan.  They also request that a minimum language in a confirmation order assuring parties who opted out of the consensual releases, that they're not bound by them.

The U.S. Trustee also objected to exculpations, but at a hearing in mid-December, the debtors and the U.S.T. informed the Court that they had agreed to resolve that objection.

The Court considered the motion to dismiss and plan confirmation in evidentiary hearings that took place on December 17th and the 19th.  Many exhibits, including declarations, were admitted in the record.  The Court heard live testimony from debtor CEO, the Chair of the Board of Intrum AB, and an expert witness on Swedish insolvency law.

The Court took both matters under advisement and today provides its rulings.

Note that the Court has jurisdiction under 28 U.S.C. 1334(b).  A motion to dismiss and plan confirmation issues are

court proceedings under 28 U.S.C. 157(b).

So the Court has constitutional authority to enter final orders and judgments in accordance with Supreme Court's holding in Stern v. Marshall, 564 U.S. 462, 2011 case.  It's been U.S. proper in this district under 28 U.S.C. 1408 and 1409.  I'm going to start with some background and then turn to the rulings.

Intrum AB, whom I'll refer to as Intrum, is one of Europe's largest debt collection companies.  Intrum is a Swedish company that operates in 22 countries and, in addition to debt collection services, provides credit management services to clients.  Intrum, together with its debtor and non-debtor subsidiaries, employs about 10,000 people.

Intrum's capital structure included a revolving credit facility, a term loan facility, and nine unsecured note issuances.  The notes are made up of senior unsecured notes, medium term notes, and private placement notes.  The revolver matures in 2026.

The senior unsecured notes mature in 2020 to '25, 2027 and 2028.  These notes are governed by New York law.  The medium term notes mature in '25 and in '26, and they're governed by Swedish law.  The private placement notes mature in 2025, and they're also governed by New York law.

Before the start of these Chapter 11 cases, Intrum began experiencing financial challenges.  It was facing high

inflation rates, high interest rates, slow growth, and a high cost of borrowing.

To increase liquidity, Intrum publicly announced in January 2024 that it would sell a major portfolio of assets and use those proceeds to reduce debt.  Markets reacted negatively, and Intrum's share price dropped significantly.  Credit agencies downgraded Intrum and its affiliates, and Intrum's outstanding debt instruments began trading at a discount.

According to Intrum's CEO, Mr. Rubio, who testified in court, some series of debt was trading as low as into the 50s.  Following the market reaction, Rubio testified Intrum believed it needed to restructure its debt to meet all of its long-term obligations.  With cash on hand, it could likely satisfy an early 2025 maturity.

The debt held by the objecting ad hoc group here, but without significant market access, it was not going to meet maturity in 2026 and after.  The company wanted to amend and extend its debt, but with its debt rated at single C and its debt trading at meaningful discounts, and equity having come down significantly, Rubio said the company effectively had no market access.

The company hired restructuring professionals to engage its lenders.  Two groups formed.  The first group was the ad hoc group who holds 2025 debt.  A second group, who now supports the plan before the Court, holds some of the 2025 and

most of all of the '26, '27, and '28 debt.

The 2025 ad hoc group's proposal was for Intrum to take its outstanding unsecured debt and 100 cents on the dollar, agree to an uptier transaction, give them security interests, and extend maturities on better terms. An uptier is a transaction where borrowers access new capital by amending their existing debt documents to permit what is often senior or superpriority debt. This proposal presumes that after the uptier, the remaining unsecured debt would trade further down, and Intrum could then get financing from the ad hoc group, third parties, or later repurchase its long-term debt at a discount.

This Court and this district have extensive experience with uptiers and the potential litigation that comes along with them, especially those that aren't done on a pro rata basis.

The second group offered what is essentially the plan before the Court, taking all the unsecured creditors, the '25, '26, '27, '28 notes, putting them in a single class in the plan, exchanging the debt for notes that mature in '27, '28, '29, and '30, essentially pushing out two years at a 10 percent discount. In return, Intrum would issue 10 percent of its equity to the note holders, along with improved interest rates, tighter covenants, and clearer enforcement.

The proposal would also provide Intrum new money to

8

go into the market and repurchase any notes trading at a discount to further enhance deleveraging. Rubio and Intrum's board chair, Mr. Lindquist, said Intrum eventually chose the second option. Rubio testified it provided near-term deleveraging and right-sized the company's overall projected debt maturity problem.

Intrum eventually entered into a lock-up agreement with note holders from the proposed proposal group Intrum accepted. Intrum amended the lock-up agreement in August of 2024 after reaching agreement with a group of lendings holding the majority of the revolver debt.

In October of 2024, Intrum AB of Texas LLC, a wholly-owned subsidiary of Intrum, was created under Texas law. The lock-up agreement established the debtors' restructuring. The lock-up agreement in the debtors' Chapter 11 plan proposes to extend the revolver maturity date to 2028, reducing the revolver to about 1.16 billion, reinstates repayment of the senior secured loan, exchanges all existing unsecured notes into second lien exchange notes at a 10 percent discount to face value with new maturity dates proportionally from '27 to 2030, over 550 million in new money coming in as a 1.5 lien for discounted buybacks, payment in full of all general unsecured claims, and two classes were entitled to vote on the plan. The revolver claims and the note claims.

The plan treatment for all notes is the same under

the plan.  Any difference in the payment on the ultimate claims amount is based on the terms of a particular debt instrument. The plan also contemplates that following confirmation of the plan, the debtors would start a proceeding in January that will allow for implementation of the plan around Intrum in Sweden through a Swedish company reorganization under the Swedish Company Reorganization Act.  Swedish court would determine its own date for Intrum and the affected parties in any voting on a Swedish reorganization plan.

In October of 2024, Intrum announced that in November of 2024 there would be a meeting.  It would amend the terms of the notes and add Intrum Texas as a guarantor for the relevant notes.  It was also announced that Intrum would seek to start a Chapter 11 bankruptcy case in Texas.  This meeting occurred in November and before the cases started, Intrum Texas was added as a guarantor.

The pre-petition solicitation of votes on the Chapter 11 plan yielded great support.  Lenders holding 100 percent by amount of voting claims under the revolver and holders of about 82 percent by amount of voting claims under the notes voted to accept the plan.

So the plan enjoys the overwhelming support of every voting class in addition to the secured lenders and its largest unsecured creditor.

Around this time, the ad hoc 2025 note holder group,

whose proposal was not accepted by Intrum, started litigation in Sweden seeking a declaratory judgment that amendments adding Intrum Texas as a guarantor were invalid.  November 2024, the debtors started these Chapter 11 cases.

As of the petition date, Intrum Texas is a guarantor under the revolver of the senior debt and the senior unsecured notes.  As of the petition date, the principal balance is owed by Intrum under debt instruments were a little over a billion under the revolver, 95 million under the senior secured term loan, about 3.45 billion under the unsecured notes.  That brings interim's total indebtedness to about 4.6 billion.  And 3.3 billion of that debt was scheduled to mature in 2025 and 2026.

The Court held combined hearings about the adequacy of the disclosure statement, plan confirmation, and the motion to dismiss on December 17th and December 19th.  I'm going to start with the motion to dismiss.

The ad hoc group seeks dismissal for three primary reasons.  First, it argues the debtors are not suffering apparent financial distress, let alone immediate financial distress that would support the finding of good faith.  The ad hoc group's focus on the financial distress requirement primarily comes from the 2023 Third Circuit decision in LTL Management, 64 F.4th 84 (3d Cir. 2023).

In that case, the Third Circuit held that a debtor

who does not suffer from apparent immediate financial distress cannot demonstrate its Chapter 11 petition serves a valid bankruptcy purpose supporting good faith.  The ad hoc group relies also on a series of insolvency reports Intrum had prepared to comply with Swedish law.  These reports show that Intrum could pay debts for the next 18 months, which means that the ad hoc 2025 notes could be paid in full.

The ad hoc group also relies on Intrum public statements to the market that its proposed Chapter 11 case was not associated with insolvency or liquidation and that in October 2024, Intrum was saying that it was not currently experiencing any liquidity constraints or breach in any financial covenants under its current debt obligations.

Second, the ad hoc group emphasizes that Intrum AB is domiciled in Sweden and has no operations, hard assets, or employees in the United States and that it created Intrum Texas before the filing for the purposes of depositing funds in a U.S. bank to quote, unquote, "manufacture U.S. venue and jurisdiction."  That Intrum Texas itself has no hard assets, employees, or operations to reorganize.

The ad hoc group believes this alone proves these Chapter 11 cases further no valid bankruptcy purpose and should be dismissed.

Third, international comedy considerations may warrant favor of dismissal according to the 2025 ad hoc group.

For this argument, the ad hoc group focuses on cases like In re: Yukos Oil Co, 321 B.R. 396, (Bankr. S.D. Tex. 2005), which was actually decided in this very courtroom, where a bankruptcy judge in this district considered concepts of international comedy in determining that cause existed for dismissal under Section 1112.

The ad hoc group also claims that Intrum's plan could not be confirmed under Swedish law and that a condition precedent to the plan going effective is a Swedish court approving the Swedish reorganization plan on a final basis. The ad hoc group believes that this Court is being asked to provide an advisory opinion on a restructuring that must be approved in Sweden, which has no international agreement to honor any order of this Court.

The debtors and its -- the debtors vigorously disagree, and the supporting lender groups who voted in favor of the plan also disagree that this case should be dismissed and believe that these cases were filed in good faith.

Interpreting the Bankruptcy -- the Code, interpreting the Bankruptcy Code begins with analyzing the text, Whitlock v. Lowe, 945 F.3d 943, pincite 947, (5th Cir. 2019), in which it said, in matters of statutory interpretation, text is always the alpha.

BedRoc Ltd., LLC v. United States, 541 U.S. 176, pincite 183 (2004), quote, "The preeminent canon of statutory

interpretation requires the Court to presume that the legislature says in a statute what it means and means in a statute what it says there."

Section 1112(b) requires a bankruptcy court to convert a Chapter 11 case to one under Chapter 7 or to dismiss the case, whichever is in the best interest of creditors and the estate for cause, unless the Court determines that appointment of a trustee or an examiner under 1104(a) is in the best interest of creditors and the estate.  The Bankruptcy Code provides a non-exclusive list of about 16 examples that constitute cause in 1112(b)(4).

Section 102 of the bankruptcy court confirms, however, that the word includes in 1112(b)(4) is not to be construed as limiting.

Sio while the examples of cause in 1112(b) are non-exclusive, we do learn something from them.  They all refer to post-petition acts, failures to act, or events that occur after an estate is created by the filing of a bankruptcy petition. Here are a few examples.

Substantial loss to or diminution of the estate, gross mismanagement of the estate, failure to maintain insurance that poses a risk to the estate, unauthorized use of cash collateral, failure to comply with an order of the Court, unexcused failure to timely pay or timely -- excuse me, unexcused failure to satisfy timely any filing or reporting

requirement established by Title 11 or any bankruptcy rule, failure to attend a 341 meeting of creditors, failure to pay taxes owed after the petition date.

Prepetition bad acts, bad actors, or poor managers are expressly addressed in a different part of Section 1112 where the Court can order the appointment of a trustee with oversight over the estate, convert the case, or appoint an examiner to investigate prepetition acts that may have harmed the estate.

All of this makes sense when considered as a whole because the Court can only dismiss a case for cause if it's in the best interest of the estate and creditors.

Fifth Circuit also provides guidance. Little Creek, 779 F.2d 1068, 1072, pincite 1073 (5th Cir. 1986) provides guidance. That decision says the term cause affords flexibility to bankruptcy courts to find that the debtors filing for relief was not in good faith

This point was also reiterated in In re Humble Place Joint Venture, 936 F.2d 814 (5th Cir. 1991). Little Creek also instructs that considering the good faith of a filing requires a, quote, "On the spot evaluation of the debtors financial condition, motives, and the local financial realities."

Little Creek was a single asset real estate, so all the specific factors listed in that case don't exactly fit every fact pattern. But I don't think one should focus too

much on Little Creek as a single asset real estate case.

The Fifth Circuit's guidance was to conduct an on-the-spot evaluation.  Heeding that guidance, a court should rule based upon all the circumstances before it and determine whether a debtor filed to pursue a valid bankruptcy purpose.  I use bankruptcy purpose and not reorganization purpose intentionally because not every Chapter 11 debtor rehabilitates.  Many liquidate.  Chapter 11 expressly permits a debtor to file a liquidating plan.

The Fifth Circuit in Little Creek noted that every bankruptcy statute since 1898 has incorporated or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings.

And historically, that's true.  For example, before the enactment of the Bankruptcy Code, Section 141 of the Bankruptcy Act required a judge to enter an order approving a petition if the judge was satisfied the case was filed in good faith or to dismiss the case if not so satisfied.  Thus, early approval by a judge was needed to even administer in a state.  A judge didn't even have to hold a hearing.  Section 146 of the act provided a non-limiting list of examples of what were deemed not good faith filings.\

For example, that it was unreasonable to expect that a plan of reorganization could be affected was deemed a not good faith filing.

Section 1112 of the Bankruptcy Code changed the timing in how the challenge to a lack of good faith filing can be raised. It's no longer an initial judicial assessment in order to administer the estate. A Chapter 11 petition filing is all Congress says it takes to create and enjoy the protection of the automatic stay.

And because an estate is created, the Bankruptcy Code says a judge can only dismiss for cause upon consideration of the estate and creditors. There are steps and findings required before dismissal.

Bankruptcy judges, however, continue to play an important role. Bankruptcy courts retained authority to dismiss cases under Section 1112. Does the fact that Section 1112(b)(4)'s examples of cause are all post-petition mean that a court should not consider prepetition acts in a cause analysis at all? Of course not. Right? The opposite is true.

The Fifth Circuit recognized that the good faith standards prevent abuse by debtors, quote, "whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes," end quote. And determine that a lack of good faith constitutes cause under Section 1112(b). That's the pincites around 1071.

Little Creek also says a good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons available only to

those debtors and creditors with, quote, "clean hands."

So any analysis of good faith requires an on-the-spot analysis to consider the reasons for filing and the actions taken in the case. For example, a company that files a Chapter 11 only to avoid paying creditors and has no prospects of proposing a viable Chapter 11 plan is a prime candidate for potential dismissal. Prepetition acts must be considered along with post-petition acts. Again, the focus is on the interest of the estate and creditors.

And an on-the-spot analysis also allows a potentially unpopular debtor in the marketplace who, for example, may have had to close many of its locations a chance to prove its motives are right to right-size a business or maximize value for its creditors.

I should also note that the U.S. Supreme Court has said that, quote, "Preserving going concerns and maximizing property available to satisfy creditors are valid bankruptcy purposes." That's the famous 203 North LaSalle decision, 526 U.S. 434 pincite 453 (1999). And I agree with other courts that a good faith debtor who tries to preserve or create some value using the tools of bankruptcy is a good faith debtor.

And it's not bad faith to use the tools of bankruptcy afforded by Congress in bankruptcy.

The ad hoc group wants the Court to dismiss the case because there's no financial distress. And in LTL, the Third

Circuit dismissed the first Chapter 11 case of LTL Management, LLC.  The Third Circuit, relying on prior Third Circuit cases, said the theme is clear.  Absent financial distress, there's no reason for Chapter 11 and no valid bankruptcy purpose.

As stated earlier, the ad hoc group relies on the solvency analysis Intrum had prepared to show that it could pay its debts for 18 months.  That means it could have paid off the 2025 notes in full and theoretically remained solvent.

The ad hoc group also points to contemporaneous statements made by Intrum that it was insolvent.  These facts, while all true, don't justify dismissing these cases.

A few points here.  First is that insolvency is not a requirement to be a debtor under the Bankruptcy Code.  LTL and many cases around the country note that.  But here's some additional textual and historical analysis to confirm it.

Before the enactment of the Bankruptcy Code, an essential part of what was every Chapter X or Chapter 10 petition, which was the reorganization for corporate entities, there was a Chapter 11 as well, but I'm going to focus on Chapter 10 here, was that the corporation was, quote, "insolvent or unable to pay its debts as they mature."

Section 130 of the act required every Chapter X petition to state that.  The corporation was insolvent or unable to pay its debts as they mature.

Section 1, Subsection 19 of the act defined

insolvency.  A person was deemed insolvent within the provisions of the title whenever the aggregate of property shall not, at a fair valuation, be sufficient in an amount to pay debts.  The insolvency or unable to pay debts in the ordinary course requirement was not included in the enactment of the Bankruptcy Code.  The current bankruptcy petition asks no such questions anymore.

There's no language requiring insolvency in Section 109 of the Bankruptcy Code.  I would also note that even the most recent edition of Subchapter 5 didn't require insolvency. It instead requires debtors to be engaged in commercial or business activities.

Second, the express financial distress standard in LTL is not binding on this Court, but I think it could be a factor as part of the Little Creek on-the-spot evaluation.  And I do consider the solvency analysis, the company's statements, that it could have paid the 2025 notes on time.

But I also consider the CEO's statements about the financial condition Intrum was in after the downgrades.  The company believed it needed to restructure all of its debts to meet all of its long-term obligations.  With cash on hand, it could likely satisfy an early 2025 maturity that held by the ad hoc group, but that without any significant market access, it was not going to meet all of its maturities in 2026 and after.

The company wanted to amend and extend its capital

structure, but with single -- but excuse me.  With debt rate at single C, debt trading at meaningful discounts, and equity having come down 80 percent, Rubio said the company effectively had no market access.  That's the company's motive, and filing was not to harm the 2025 note holders or some other bad faith motive.

I also note that a company doesn't need to become insolvent or enter the zone of insolvency by paying off some debt after considering the effect of what that would mean. Would it be better for a company to wait to the last minute, even ensure more financial problems before engaging with lenders, wait till the last minute and not pay, and then file, or wait until debt is accelerated and then file Chapter 11, and then have to worry about contested use of cash collateral or financing for its case?

If the runway of financial trouble is clear, then it's not bad faith or cause to dismiss these cases.  The CEO's testimony was credible that while the company may have been solvent, paying the 2025 notes would not have solved its other problems in 2026 and beyond.  It was already struggling to gain access to the credit markets.

One also cannot look that there were billions coming due in 2026.  The 2026 maturity was significant.  It was over $2 billion.

The company had every right to consider its long-term

21

viability and employees, right, and we're not talking about, you know, debt that's coming online in, you know, five to ten years.  We're talking 2026.  Financial distress isn't an absolute gatekeeper.

Even still, LTL is different than this case.  The LTL court found in its filing, LTL didn't have any likely need in the present or the near term or even in the long term to exhaust its funding rights to pay claimants.  The Third Circuit also said it would be unwise to attempt a tidy definition of financial distress justifying in all cases.

Let's not over -- also overlook that these cases have massive creditor support.  All right.  Over 2 billion of noteholder claims voted to accept the plan.  Coupled with the RCF claims, that's over 3 -- about 3.5 billion voting to accept.  That's not even getting to the Court to consider the likelihood of a plan being confirmed before dismissal if it's in the best interest of the estate and creditors.

Remember, the focus of Section 1112 is on the estate and creditors.  In these cases, I do find there was current financial distress in the market and further distress, and it was foreseeable on the horizon.

The company faced choosing an uptier and potentially upsetting most debt holders or seek a restructuring that amends and extends all its maturities by several years, which I find is another important point.  They didn't try to stretch anyone

out 10 to 15 years unnecessarily, for example.  The debtors have also acted in good faith in their requirements as Chapter 11 debtors during these cases and have not sought delay in these cases.

The debtors have not acted throughout these cases with any improper motives based upon the record before me as it relates to the company trying to reorganize in Chapter 11 or to restructure for bad faith reasons.  There were valid bankruptcy purposes in filing these cases.

The next argument is that Intrum should not be a U.S. Chapter 11 debtor.  The ad hoc group points to these facts. Intrum may be as a Swedish company with no hard assets or employees in the United States.  Intrum Texas was formed shortly before the case was filed as a limited liability company.  Intrum Texas guaranteed the Intrum debt before the filing.  Intrum Texas had an office that no one had gone to and no employees.  Intrum Texas deposited about $50,000 into a Texas account to help bolster jurisdiction.

The ad hoc group also argues that no immediate financial distress coupled with little to no U.S. ties makes this case different than other cases where foreign entities have started bankruptcy cases with an intent to file a foreign case later.

Again, I'll start with the text of the Code.  Section 109 (a) of the Bankruptcy Code says who may be a Chapter 11

debtor.  It says a person who resides or has a domicile or place of business or property in the United States may be a debtor.

The term person is defined to include corporate entities like Intrum Texas, which no one can test as a validly formed Texas entity.  As a Texas entity, its domicile is Texas.

And as a result, it can file anywhere in the state.  Bankruptcy courts across the state are in uniformity on this point.  So Intrum Texas had the right to seek Chapter 11 relief in the United States and in this district.

It also owns a bank account worth about $50,000.  The office is really more like a place to receive mail and serve documents.  Intrum Texas, on the petition date, is also a guarantee on billions of debt.

Intrum AB also owns cash in a Texas bank account, has retainers that were not fully expired before the petition date with Texas Council, and its subsidiaries have about $1.8 million in accounts receivable that flow to it from subsidiaries in the United States.  Some of the debt is also governed by U.S. law, which some courts have said meets their property requirements for 109 purposes.

As each entity on its own satisfies Section 109 for bankruptcy purposes, and Intrum Texas allows them to file in this district.

These cases resemble another case recently filed in

24

this district where a Swedish company seeks to reorganize under U.S. law and then start a case under Swedish restructuring law. Outside of this district, these are also similar cases to ones like SAS, Philippine Airlines, and Arcapita Bank, to name a few.

I also stress and disagree with the ad hoc group 2025 note holders based on the on-the-spot analysis and consideration of the debtors' motives. I do find that there was current financial distress and current need to file for Chapter 11 bankruptcy.

There's nothing wrong with reaching agreement with a majority of its lenders. And I do find that the board carefully considered two proposals, and I see nothing in the record before me that shows a proposal that satisfied all of its long-term debts and mitigated litigation risk.

Now, based on the record before me, there's no bad motive for trying to save a company through restructuring in late 2024, going into 2025, and dealing with looming maturities to try to avoid. And nothing here was intended, based upon the record before me, to defraud or to intentionally design to harm a particular creditor group. This was a good-faith filing.

If Intrum had filed a loan with no support, no real reason to be here, then I think you look at the case differently. But that's not the case that we have here. It's hard to imagine a prepacked case with billions of dollars of

secured and unsecured debt saying we support your decision to file and where you will file and the timing of the filing and agree to provide funding, and everyone will be treated equally on account of their claims, and general unsecured creditors will be paid in full and have that constitute cause as a bad-faith filing.

Venue in this district is not at issue.  It is being in the U.S.  The debtors filing their Chapter 11 plan, supported by about 3.6 billion of about a little over 4 billion of debt holders, all of which want to be in the United States.  It's a valid bankruptcy purpose for this case.

Finally, arguments about comedy are rejected for the reasons I stated earlier, based on the on-the-spot analysis.  Intrum's going to have to start a Swedish proceeding, and a Swedish court will exercise its judgment on any important matters before it.

The ad hoc group cited to Yukos.  This case is not like Yukos.  Yukos' main asset was oil and gas that was actually still in Russia.  Now, Yukos -- like in the ground.  Yukos had disputes with the Russian Federation, filed a Chapter 11 petition asking the bankruptcy court to halt the Russian government's tax collection actions and to obtain loans superior to the Russian government's claims.  Yukos also wanted to serve Russian creditors by email and to compel the Russian government to submit to international arbitration.  All of that

raised obvious questions about a bankruptcy court's jurisdiction to force participation of the Russian government, and there were natural international comedy considerations.

But comedy is a consideration, though.  One cannot overlook that Intrum is a Swedish company.  Just like the Court found in Avianca, I don't think it's warranted here to have Intrum, you know, pause these proceedings and have Intrum start a Swedish proceeding before seeking release here or suspending these cases, especially on the record before this Court and the positions taken by the overwhelming creditor's support.

I do note it is a conditioned proceeding of the effective date of this chapter -- of a Chapter 11 plan here for the Swedish reorganization plan to be confirmed.  That's not uncommon in these kind of cases.  A Swedish court will make its own determinations in the future.  I have nothing to say about that.

The effect of any confirmation order that I would enter is limited to its words and will have the effect of law that it has.

So let me turn now to disclosure statement and plain confirmation issues.

No party really disputed the disclosure statement, but I think the Court still has an independent duty to determine that the disclosure statement satisfies the applicable requirements of the Bankruptcy Code.  I'm going to

note that the disclosure statement and the related exhibits contain sufficient information of the kind necessary to satisfy the disclosure statement requirements.  It contains adequate information as such term as defined in Section 1125 of the Code.

I'm going to find that the filing of the disclosure statement satisfied Bankruptcy Rule 3016 and the injunction released in the exculpation provisions in the plan and in the disclosure statement were described in bold font with specific and conspicuous language.  In all, acts to be enjoined and identity of entities that would be subject to an injunction by this Court were in bold font and with conspicuous language, so Bankruptcy Rule 3016(c) was satisfying.

I know the U.S.T. objects to language in one ballot that could be read to bind someone who opted out of the releases.  To avoid any such confusion, the confirmation order will need to state that any party who opted out of the third-party releases in the plan is not bound by such releases.

The ad hoc group of 2025 note holders objected to plan confirmation.  They argued that the plan doesn't comply with 1129(a)(1) and (a)(2) because the plan was not proposed in good faith, provides for the payment of original issued discount disallowed under Section 502(b), and impairs parties' due process rights by enjoining challenges to the anticipated Swedish restructuring.

Note that Section -- Bankruptcy Code does require that the plan be filed in good faith and not by any means forbidden by law.  Fifth Circuit has held that good faith should be evaluated in light of the totality of the circumstances surrounding establishment of the plan, mindfulness of the purposes underlying the Code, and that generally where a plan is proposed with a legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement is satisfied.  That's the famous Village at Camp Bowie decision, 710 F.2d 239, pincite 247, (5th Cir. 2013).

The good faith analysis here is about filing the plan, which is different than the 1112(b) good faith analysis, but you can see that the considerations, kind of the on-the-spot evaluation, looking at all the circumstances that surround either the filing of the case under 1112(b) and the consideration of how the plan was filed, the considerations that went into filing, the Fifth Circuit is consistent in how it considers analyses for good faith and gives bankruptcy courts and instructs bankruptcy courts to kind of consider everything in light of a case.

The plan addressed Intrum's financial issues, which were significant.  Let's be honest about it.  The debtors had about 4.6 billion of funded debt obligations as of the petition date.  Again, over $3 billion was set to mature over the course

of 2025 and 2026.

The plan maximizes the value for all stakeholders through a deleveraging of the balance sheet and a reorganization of their capital structure, allows debtors to pay their debts when they become due, and is a step towards renewed access to the capital markets.

And again, all note holders are being treated under the plan on a pari passu basis. So based upon the entire record before the Court, there's little doubt that this plan was proposed in good faith for an honest purpose to reorganize and has reasonable hope of success.

The original issue discount objection is not really a bar to confirmation. 1129(a)(1) and (a)(2) of the Code provide respectively that a plan and the plan proponent must comply with the applicable provisions of the Code and applicable law. Section 502(b)(2) of the Code governs allowances of claims and interests.

And I need to determine whether certain amounts of the notes claims are allegedly arising from OID should be disallowed or allowed today. That's because no holder of notes is receiving more than the allow amount of its claim. All holders of its allowable claim, I should say. That's because no holder of notes is receiving more than its allowable claim. They're receiving about 90 percent of the value of their claims.

The ad hoc group objects to OID, but interestingly, not to the agreed inclusion of the post-petition interest. That's part of the allowed claim that benefits that group.

But the real reason is that all of it works -- is because this plan approves a global settlement. It's really just about getting to the number, and that number is below the full value of the potential debt claims. The ad hoc group objects, but it's benefiting from the economics of the settlement. It will receive interest on its notes, and it's got one of the higher interest rates.

So based upon the record, this is really undisputed, the settlement was necessary to implement the debtors' restructuring and to maximize the value for all stakeholders. Bankruptcy Rule 9019(b) provides for the Court authorization of the settlement, and the settlement can be, and the Bankruptcy Code allows settlements to be part of the plan.

There's also no violation of Section 1123(a)(4). That requires a plan to provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim agrees to less favorable treatment.

Now, the equality addressed by 1123(a)(4) extends only to the treatment of the members of the same class of claims, not to the plan's overall treatment of the creditors holding those claims. Creditors shouldn't confuse similar treatment of claims with equal treatment of claims.

31

Parties can receive the same distribution in a class, but then a subset of those creditors can receive other forms of compensation for matters unrelated to their plan, assuming there's a justification for it, right?  Or there may be differences in the debt instruments within the proper class of claimants, like you have here, different issuances of notes.

So allowances of what can be considered OID and the payment of certain fees to supporting creditors doesn't violate the equal treatment principle set forth in 1123(a)(4).  That one set of note holders has different contractual entitlements to another so it doesn't render a plan unconfirmable.

To the extent that there is OID, it's also allowable under the plan as part of the global settlement, right?  The lockup agreement is also assumed, so the consent fees, which were offered and available to the ad hoc group prepetition, you know, can be approved and paid on those terms, right?  These fees are not being paid on account of the claim.  There's other consideration going on there.

I would say that it appeared to the Court that certain -- at least the ad hoc group believed that they may be entitled to some OID.  And I think if they think they should, then -- and I think I can review note agreement language and determine if they're entitled to it, but I don't think that's a bar to plan confirmation, right?  Under the plan, again, all notes claims are subject to the same treatment and any

disparity of payment is based on the debt term documents.  It's not caused by the plan.

Finally, the injunction provisions, I think, are customary and appropriate.  I don't think they preclude parties from raising issues of Swedish law.  The confirmation does contain a number of findings and provisions authorizing the debtors to implement the plan.

I think the injunction really just reiterates kind of keeping everything in place until the effective date of the plan, and again, that's really largely dependent upon factors that are outside of this Court.  But nothing in the plan prevents the ad hoc group or others from, I think they have rights under Swedish law.

Let me finally turn to the Office of the United States Trustee's objection on releases.  It's kind of a common objection now here in the Office of the United States Trustee for around the country.

Based upon the Supreme Court's recent decision in the Purdue Pharma case that resolved a circuit split about non-consensual third-party releases in Chapter 11 plans, the Supreme Court held that the Bankruptcy Code didn't authorize a release, an injunction that is part of a plan of reorganization under Chapter 11 effectively sought to discharge claims against a non-debtor without the consent of affected claimants.  The Office of the United States Trustee is a party that has

statutory rights to appear and be heard on any matter.

In this case, they can continue to raise this objection. I've got no issues with it. I think we have, quite frankly, some of the best United States Trustees in the United States. They're some of the hardest-working ones, too. A lot of cases get filed in this district, which requires that the Office of the United States Trustee works late. They work on weekends. And they have every right to fulfill what they believe is their duty to continue to raise these objections.

I'm just going to disagree with them on this one. And to note, and I reiterate, and I've said this in the Diamond Sports confirmation hearing, and I also ruled in Robertshaw, that, you know, Purdue decision was about non-consensual third-party releases. Justice Gorsuch also clarified that nothing should cast doubt on consensual ones, and nothing is construed to question consensual third-party releases there. And I read those words literally.

The Supreme Court, I'm not here to expand or narrow the scope of the Supreme Court's holding. And I do find that the consensual releases in the plan satisfy applicable law and the procedure for complex cases in the Southern District of Texas. Parties were provided detailed notice about the plan, the deadline to object to the plan confirmation, the voting deadline, the opportunity to opt out of the releases. They were made in conspicuous language.

The disclosure statement included a detailed description about the third-party releases, which were consensual, and the opt-out. The ballots allowed parties to carefully review those terms. Intrum also caused the third-party release language to be published.

So based upon the record, the release is specific enough to put releasing parties about notice about the types of claims released and that the opt-out worked. There's no evidence in the record of coercion or confusion by parties. I also think that their consensual third-party releases were narrowly tailored to this case. They really related to, among other things, the debtors in their Chapter 11 cases, their estates.

And there's a carve-out for actual fraud, willful misconduct, or gross negligence. So you know, any bad acts are not being released here.

And I do know, and I think it's an important one, one that you don't often see, and you see it because it's a prepack. General unsecured creditors are paid in full, and they're not subject to the consensual third-party releases here. So concerns about the opt-out and potential unfisticated parties receiving it, really not an issue here.

The ad hoc group of 2025 note-holders is led by some of the best lawyers in America. They have the opportunity to opt-out, and based upon the voting record, it appears they did

just that.

I would also note that there's unrefuted evidence that the third-party release was an integral part of the plan and a condition of the settlement set forth in the plan, and they were a core consideration, right, among the parties to their agreements and the lock-up and instrumental in the development of that.

And they were instrumental in facilitating and gaining support for the plan. and the Chapter 11 cases.  I'd note that the plan satisfies every other applicable code section under 1123 and 1129 and every other applicable plan confirmation-related section of the Code.

I'd also note that the debtors, the professionals that have appeared before me, the actions of the board based upon the record before me, and every party who has appeared before me, and I also include the ad hoc group of 2025 note-holders, there was the unsecured creditors and the note-holder groups who supported the plan as well.  I'm thinking about and looking out and seeing a couple of them here today.  Everybody acted in good faith throughout the case, and they're entitled to those findings from me.

I also find that based upon the record before me that the parties involved in the solicitation of the plan are entitled to the protections under Section 1125(e) of the Bankruptcy Code.  So I'm going to affirm and confirm the

Chapter 11 plan of Intrum.  I'm going to overrule and deny the motion to dismiss.  I'm going to overrule all the plan confirmation objections.

I'm just going to -- to the proposed confirmation order that was on file, I'm going to add a sentence.  I did it in Robertshaw, too, that kind of added, kind of for the reasons as well stated today on the record, and then also kind of the language that I know that the Office of the United States Trustee was looking for.  It's a sentence that we added in the Robertshaw confirmation order that just confirms that notwithstanding anything to the contrary, anybody who opted out is not bound by any such releases.

And I'll get that on file and on the docket shortly. I'll get in orders on file.

I know it's December 31st and different times everywhere else.  I wish everyone a happy New Year, and I thank everyone for the excellence that was just throughout the entire process.

I know I tell parties I try to get them something by the -- before then, but I really wanted to take the weekend to really kind of help crystallize and articulate some of the analysis, and I wanted to go back and do some additional studying and read cases and not rush it.

It's an important case to many people for different reasons, and I wanted to make sure that -- I, you know, if I

wanted to take the time to read and think more, that I took every liberty to do so, and I'm comfortable with the Court's decision.  So I thank everyone.  Have a good day.

We're adjourned.

(Proceedings concluded at 11:56 a.m.)

* * * * *

C E R T I F I C A T I O N

I, Heidi Jolliff, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

HEIDI JOLLIFF, AAERT NO. 2850    DATE: January 2, 2025

ACCESS TRANSCRIPTS, LLC